## PATRICK KELLY DAWSON *v.* STATE OF MARYLAND

[No. 315, September Term, 1971.]

*Decided December 23, 1971.*

The cause was argued before MORTON, ORTH and MOY-LAN, JJ.

*Sidney Blum* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Raymond G. Thieme, State's Attorney for Anne Arundel County,* and *Frank R. Weathersbee, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

PER CURIAM. MOYLAN, J., concurs in the result and filed a concurring opinion at page 24 *infra*.

The appellant, Patrick Kelly Dawson, was convicted in the Circuit Court for Anne Arundel County by Judge E. Mackall Childs, sitting without a jury, of four separate offenses: 1) unlawful possession of dilaudid; 2) unlawful carrying of a dangerous and deadly weapon; 3) unlawful possession of marihuana; and 4) unlawful maintenance of a house for the keeping of narcotic drugs. Articles of contraband, clearly sufficient to sustain the convictions, were found by the police in the home and in the automobile of the appellant. The pivotal issue, raised by the appellant in his motion to quash the search and seizure warrant and resolved against him below, is whether the application for the warrant contained adequate probable cause to justify its issuance.

The first, second and sixth paragraphs of the six paragraph application were essentially formal in nature. The heart of the application was in the third and fourth paragraphs, which recited information from and information about three anonymous informants:

"I Officer Gray having received information from a reliable informant who has been established as being reliable in the past by information which led to the arrest of eight persons for violation of the narcotic laws and three persons for burglary that one, Patrick Dawson, a white male twenty nine years old, is dealing both Marihuana and Dilaudid in the area of Ponca and Eastern Ave. in Baltimore City.

Information from a second reliable informant whose reliability has been established in the past by the arrest of two persons for narcotics and one for burglary that one Patrick Dawson is dealing Dilaudid from his auto, a Black Ford approximately a 1963 model in the area of Ponca and Eastern Ave. in Baltimore City. He further states that Patrick Dawson said that he kept

the narcotics at his house in Glen Burnie Anne Arundel County. Information from a third informant whose reliability has been established from the arrest of two persons for narcotic violations that Patrick Dawson lived in a Pink shingled house at 7829 Oakwood Rd. Anne Arundel County, and that he held Dilaudid and Marihuana in his house and in his autos";

and in the fifth paragraph, which recited the following:

"I officer Michael Gray have observed this Black 63 Ford in the area of Ponca and Eastern Ave. in Baltimore City on numerous occasions at approximately nine PM. I also went to 7829 Oakwood Rd. and observed the person known to me as Patrick Dawson going into this house. I have also observed a Red Chev. Maryland registration GS 7609 sitting in the driveway, the auto is listed to Patrick Dawson, 7888 Crain Highway, to a 1960 Lincoln. I have observed Patrick Dawson in this 60 Lincoln in the area of Ponca and Eastern Ave. on one occasion. My third reliable informant, told me that Patrick had sold this Lincoln. I further observed the Black Ford, Maryland registration HP 4135 listed to Norma A. Dawson 7888 Crain Highway, the above auto is a 1964 Ford."

Judge Childs, at the suppression hearing, declined to consider, on the issue of probable cause, the information furnished by the first informant and by the third informant. He ruled that no substantial basis was shown to indicate that either informant had come upon his information by direct observation. He ruled, however, that sufficient supporting facts had been furnished by the affiant to the magistrate to satisfy him both that the second informant had come upon his information directly and that the second informant was credible. The appellant here attacks the "credibility" aspect of that ruling.

In his affidavit, the affiant set out for the magistrate

the fact that his "reliability has been established in the past by the arrest of two persons for narcotics and one for burglary." The affidavit also set out certain independent observations made by the affiant himself, which tended to verify some of the story as told by the informant to the affiant. We hold that the combination of the recitation as to the informant's demonstrated reliability in the past and the independent, police verification of some of his story was sufficient to supply the magistrate with a "substantial basis" for crediting the hearsay information. The credibility of the informant being established, there is no question but that the affidavit set out sufficient probable cause to justify the issuance of the search and seizure warrant.

There remains only to consider the appellant's further contention that the committing magistrate of the People's Court of Anne Arundel County, who issued the warrant in this case, was without jurisdiction to issue search and seizure warrants.

Article 52, Section 98 B (9), creates the office of committing magistrate for Anne Arundel County. Subsection (a) thereunder provides that the committing magistrates:

"shall have throughout the county all the powers and jurisdiction vested by law in justices of the peace other than trial magistrates and substitute trial magistrates."

Article 27, Section 551 (Search Warrants), spells out just what the powers and jurisdiction are which are vested by law in the justices of the peace with respect to search warrants. It provides, in pertinent part:

"Whenever it be made to appear . . . to any justice of the peace in this State, by a written application signed and sworn to by the applicant, accompanied by an affidavit or affidavits containing facts within the personal knowledge of the affiant or affiants, that there is probable

cause, the basis of which shall be set forth in said affidavit or affidavits, to believe that . . . any property subject to seizure under the criminal laws of the State is situated or located . . . in or on any such building, apartment, premises, place or thing, then such . . . justice of the peace may forthwith issue a search warrant . . ."

The conferring of power and of jurisdiction is clear. The difficulty in this case arises because Article 52, Section 98B (9) (c), goes on to provide, in pertinent part:

"The committing magistrates and deputy committing magistrates shall sit at such times and places and shall perform such duties, including the issuance of warrants, the taking of bail bonds, the acceptance of collateral, and clerical functions as are assigned to them by the chief judge of the People's Court."

At the suppression hearing, Chief Judge Thomas J. Curley, of the People's Court for Anne Arundel County, testified that it was his policy to request the committing magistrates of the county not to issue search warrants. He took the position because of his feeling that the committing magistrates of the county did not have sufficient legal training to evaluate questions of probable cause. On cross-examination by the State, however, he indicated that his policy was based not on legal authority but was "a matter of personal preference." He further indicated that it was several years earlier that he had made his feeling "generally known." There was no indication that he had ever communicated to the committing magistrate in this case any direct prohibition against the issuing of search warrants.

We feel that Article 52, Section 98B (9) (c), is directory in nature and is intended to foster the orderly administration of the People's Court of Anne Arundel County by giving to the chief judge thereof the power

to assign duties and caseloads as he sees fit. We do not believe it was intended to diminish the official powers and the jurisdiction of the committing magistrates at the pleasure of the chief judge. We feel further that, in any event, the expression of a "general indication" several years earlier of what was a "personal preference" could not be deemed to have divested the committing magistrate in this case of his basic statutory authority to issue search warrants.

*Judgments affirmed.*

*Moylan, J., concurring:*

I concur in both the result reached and in the opinion of the Court. I feel constrained, however, to amplify upon the reasons why I feel the warrant before us here was inadequate in one regard but salvageable in another, and also to state the salutary purpose which, I believe, is being served by several recent and controversial Supreme Court decisions, notwithstanding the disesteem in which they are held in most law enforcement and many legal circles.

In *Dawson v. State,* 11 Md. App. 694, we had occasion to treat broadly the two-pronged test for evaluating hearsay information in a probable cause setting as that test was anticipated by *Nathanson v. United States,* 290 U.S. 41, and *Giordenello v. United States,* 357 U. S. 480; necessitated by *Jones v. United States,* 362 U. S. 257; articulated by *Aguilar v. Texas,* 378 U.S. 108; explicated by *Spinelli v. United States,* 393 U. S. 410; and obfuscated by *United States v. Harris,* 29 L.Ed.2d 723.[1] In

---

1. By a 5-4 vote, the Court in *Harris* upheld the Government's appeal from an adverse decision in the Court of Appeals for the Sixth Circuit and purported to distinguish *Aguilar* and *Spinelli* in so doing. Justices Douglas, Brennan and Marshall joined in the strong and well-reasoned dissent of Justice Harlan, who had authored the *Spinelli* opinion and who has never been overly latitudinarian with criminal defendants. It was Chief Justice Burger who spoke for the Court in *Harris.* Justices Black, White, Stewart and Blackmun joined him to tally five votes for the result, but did so for three expressed reasons or combinations of reasons distinct from the total rationale of the Chief Justice. The Burger opinion was in three parts and gave three separate reasons for crediting the informant in the warrant application before the Court for re-

this appropriately entitled sequel (the appellant here is one Patrick Dawson), our focus is narrowed to *Aguilar's* "first prong," and, indeed, to a single aspect of that prong.

Conceptually, the *Aguilar-Spinelli* line of cases should pose little difficulty, having been but a natural and logically foreseeable next step in the gradual forging of Fourth Amendment doctrine.

The clear and unremitting command of the Supreme Court throughout this century has been that search and seizure by authority of a warrant is always to be preferred over a warrantless intrusion and, indeed, wherever feasible is to be required.[2] Implicit in that command

---

view. (Two of the parts dealt with independent verification and only one with the internal sufficiency of the information furnished about the informant.) Justices Black and Blackmun joined the Chief Justice on all three points to represent the solid core of three votes for whatever *Harris* holds. The authoritative force of their voices in explication of the *Aguilar-Spinelli* doctrine is somewhat muted, however, by their avowed desire in two separate concurring opinions to go further and to reverse both *Aguilar* and *Spinelli.* (Justice Black had been in dissent in both *Aguilar* and *Spinelli;* Justice Blackmun had been a member of the 6-2 majority of the Court of Appeals for the Eighth Circuit whose decision was overturned by *Spinelli.*) Justice Stewart joined only in Part I of the Burger opinion. Justice White joined only in Part III of the Burger opinion. Neither joined in Part II. The three principles for which *Harris* might be cited, therefore, muster the maximum support of four votes, three votes and four votes, respectively. It is the third of these principles that is of greatest interest in perhaps adding a new consideration to our law on probable cause. It states that a declaration against penal interest by an informant, even be he a police informant, may serve to establish the credibility of that informant.

2. In his provocative analysis *Two Studies in Constitutional Interpretation,* Professor Telford Taylor argues persuasively that, in terms of "the original understanding," the Supreme Court has "stood the Fourth Amendment on its head." See *Coolidge v. New Hampshire,* 29 L.Ed.2d 564, 598 (concurring opinion by Harlan, J.). His thesis is that the Fourth Amendment and its progenitors in various state bills and declarations of rights were a direct reaction exclusively to the general warrant for seditious libel in England and to the writ of assistance for customs violations in the North American colonies, both universally detested and both representing at least partial catalysts for the American Revolution. Warrantless searches in traditionally criminal matters, and generally as an incident of arrest, were, on the other hand, of ancient usage and were tranquilly accepted on both sides of the Atlantic as posing no threat to the liberties of the people. The Fourth Amendment was drafted and enacted, so runs the thesis, not to exalt warrants over warrantless intru-

is the concept that any decision as to whether probable cause exists so that a warrant should issue should always be made, where possible, by a "neutral and detached magistrate" rather than by a policeman. The constitutional protection consists of interposing an impartial judicial figure between the investigator and his quarry. Its philosophy was trenchantly expounded by Justice Jackson in *Johnson v. United States,* 333 U. S. 10, at 13-14:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

If the constitutional protection as so mandated was to have meaning, it followed that the decision entrusted to the magistrate must be one. of substance and not of

---

sions but rather to place hedges about the warrants themselves, as instruments so vehemently feared and hated in so recent memory. See Lasson, *The History and Development of the Fourth Amendment to the United States Constitution,* and Landynski, *Search and Seizure and Supreme Court,* for sound support for Taylor's thesis. Whatever the historical invalidity of the Supreme Court's position, however, the voice of that court in the Twentieth Century is nonetheless clear.

empty form. His was not to place a summarily-granted stamp of approval upon the policeman's predetermined course of investigative conduct but rather to make, in truth, an informed judgment.

Although the analogy is less than perfect, the function of the magistrate in determining probable cause is in its fundamental character akin to that of the fact finder in determining guilt. Burdens of proof and rules of admissibility may differ, but basically both determinations call for 1) assessing the credibility of those who furnish information and 2) then weighing such information if it is believed.

The magistrate assures himself of the credibility of the affiant-applicant both by direct observation of this primary source of information and by the constitutionally-required administering to him of an oath. The threat of perjury (and perhaps of perdition) is a classic trustworthiness device. Even to a then highly-credited affiant, however, the magistrate may not delegate his next burden of responsibility. Not even the credible affiant may offer to the magistrate simply his own sworn conclusion that probable cause exists. He must rather furnish to the magistrate enough raw data so that the magistrate may do his own concluding therefrom.

The proscription against the purely conclusory application was enunciated by *Nathanson v. United States, supra,* with respect to search and seizure warrants and by *Giordenello v. United States, supra,* with respect to arrest warrants.[3] In *Nathanson,* a Customs agent had sworn to the magistrate "that he has cause to suspect and does believe that [certain contraband is then reposing in a certain suspect premises]." The Supreme Court held that the application was fatally defective in that, "It went upon a mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Nathanson, supra,* at 46. In *Giordenello,* a Federal narcotics agent swore that the suspect for whom the arrest

---

**3.** *Giordenello* made clear that the standards for measuring probable cause are the same in the search and seizure situations and in the arrest situations.

warrant was sought had committed the crime. The Supreme Court held that application to be fatally defective:

> "The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime. . . . The Complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made." *Giordenello, supra*, at 486.

A dimension was added and the magisterial task was made somewhat more complicated with the announcement in *Jones v. United States, supra*, that hearsay information was not only appropriate to be received by the magistrate on the issue of probable cause but that it could be sufficient, unto itself, to establish such probable cause.[4]

---

4. It followed, of course, that if hearsay information could, under certain circumstances, be received at the trial on the merits itself, it should, *a fortiori*, be received in this *ex parte* proceeding before the magistrate where the burden of proof is a mere probability and where confrontation is not required. *Jones* went further and pointed out that since under *Draper v. United States*, 358 U. S. 307, hearsay information could serve as the basis for an officer's belief that probable cause existed for a warrantless arrest, it would be incongruous and would, indeed, derogate from the preferred status of warrants to hold that more would be required for the issuance of a warrant than was required for a policeman to proceed without a warrant. *Jones* held, at 270-271:

> "What we have ruled in the case of an officer who acts without a warrant governs our decision here. If an officer may act upon probable cause without a warrant when the only incriminating evidence in his possession is hearsay, it would be incongruous to hold that such evidence presented in an affidavit is insufficient basis for a warrant. . . .
> We conclude therefore that hearsay may be the basis for a warrant."

*Aguilar* and *Spinelli* followed in rectilinear descent from *Jones*. The purpose of the so-called "two-pronged test" as set out in *Aguilar* and as elaborated in *Spinelli* was simply to set the constitutional guidelines for the evaluation by the magistrate of this hearsay information. The gist of *Aguilar* is contained in the single paragraph, at 114:

> "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.' "

"Believing it desirable that the principles of *Aguilar* should be further explicated," the Supreme Court granted certiorari in *Spinelli*. It said, at 415-416:

> "The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. . . .
> Applying these principles to the present case, we first consider the weight to be given the informer's tip when it is considered apart from the rest of the affidavit. It is clear that a Commissioner could not credit it without abdicating his constitutional function. Though the affiant swore that his confidant was 'reliable,' he offered the magistrate no reason in support of this conclusion. Perhaps even more important is the fact that *Aguilar's* other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not

> told how the FBI's source received his information—it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable."

The simple thrust of these decisions is that whatever rules govern the evaluation of information from the primary source—the affiant—govern also the evaluation of information from the secondary source—the non-swearing, non-appearing, off-warrant declarant, i.e., the informant. Whether the magistrate is dealing with a primary, a secondary or even, theoretically, a tertiary source, he must still 1) assess the credibility of that source and 2) then weigh the information furnished if he believes it to be true.

Just as the magistrate must satisfy himself as to the credibility of a primary source by administering an oath to him and by looking at him, so too must he, by some alternative means, satisfy himself as to the credibility of a secondary source. In neither case, may he accept someone else's conclusion in lieu of arriving at his own. Just as he may not permit an affiant's assertion as to his own credibility to serve as dispensation for the oath, neither may he permit the affiant's assertion as to his informant's credibility to serve as dispensation for the required recital of all necessary data about that informant that will permit the magistrate to draw his own conclusion as to credibility. This is the "credibility/reliability" or "veracity" prong of *Aguilar*.

Similarly, the informant operates under the same interdict against offering his unsupported conclusion that the affiant has always operated under by virtue of *Nathanson* and *Giordenello*. Both primary and secondary source must ultimately offer to the magistrate direct observations—the data perceived by the source's own senses—so that the magistrate may draw his own con-

clusion therefrom. The affiant may not by indirection—through the tale of an informer—offer the bare conclusion that he is forbidden to offer directly. The strictures of *Nathanson* and *Giordenello* may not so simply be avoided by resort to hearsay. To permit the informant, no less than to permit the affiant, to offer an unsupported conclusion, would be to usurp the magisterial function which the Fourth Amendment forbids. This is the "basis of knowledge" prong of *Aguilar*. Anticipating *Aguilar*, Justice Frankfurter made the point most succinctly in *Jones,* at 269:

> "We held in *Nathanson v. United States* . . . that an affidavit does not establish probable cause which merely states the affiant's belief that there is cause to search, without stating facts upon which that belief is based. *A fortiori* this is true of an affidavit which states only the belief of one not the affiant."

The parallel between the standards set out 1) for evaluating a primary source and his information and 2) for evaluating a secondary source and his information seems so logically compelling that the anguish felt in many quarters over *Aguilar* and *Spinelli* is difficult to fathom.

In measuring the affidavit in this case against these standards, we see that it turns upon the "credibility/reliability" prong of *Aguilar*. In evaluating the application at the suppression hearing, Judge Childs discounted (properly, I think) all information received from the first informant and the third informant. Those incriminating allegations were defective, Judge Childs found, for failing to satisfy *Aguilar's* "basis of knowledge" prong. Both were bald conclusions that the appellant was dealing in contraband drugs, with no underlying circumstances recited as to how the informants came upon such information.[5] It was not alleged that they had ever

5. As an apparent qualification on the requirement that the means by which the informant comes upon his information be

directly observed the appellant engaged in the suspect activities. There were no assurances that their conclusions were anything more substantial than "a casual rumor circulating in the underworld", "an accusation based merely on an individual's general reputation" or "an offhand remark heard at a neighborhood bar," condemned by *Spinelli,* at 416-417.

On the other hand, the information furnished from the second informant was concrete enough in detailing its pedigree to satisfy the "basis of knowledge" aspect of *Aguilar*. The second informant significantly stated that he had heard incriminating information about the keeping of narcotics from the lips of the appellant himself. The appellant contends upon this appeal, however, that error was committed in considering this recitation from the second informant not because *Aguilar's* "basis of knowledge" prong had not been satisfied, but rather because the "credibility/reliability" prong had not been satisfied. The sum total of information furnished to the magistrate bearing directly on the credibility of the second informant consisted of the single phrase, "whose reliability has been established in the past by the arrest of two persons for narcotics and one for burglary."

Our problem is to assess the constitutional adequacy of this supporting data furnished to the magistrate to establish the veracity of the informant. From the *Aguilar-Spinelli* complex emerge three methods of demonstrating

explicitly set forth to meet *Aguilar's* "basis of knowledge" test, Justice Harlan, speaking for four members of the Court in *Spinelli,* argued that if the information is furnished in sufficient detail, it may, under *Draper,* be "self-verifying," on the theory that only a first-hand observer could ever possess such detail. The "self-verifying detail" theory rests on a shaky premise, however, for Justice White, concurring in *Spinelli* with the fifth and indispensable vote for the result, argued that *Aguilar* overruled *Draper* and cannot be reconciled with it. He refers to the "tension between *Draper* and the *Nathanson-Aguilar* line of cases." See Note, "The Informer's Tip as Probable Cause for Search or Arrest," 54 Cornell Law Review 958 (1969) for a thoughtful analysis of this doctrinal tension. In no event, however, was the information from either the first informant or the third informant in the case at bar furnished in such detail as to be even arguably "self-verifying."

such veracity, two of them intrinsic to the recitation about the informant and the third, extrinsic.

The focus of our inquiry is further narrowed, as we zero in on the veracity question, by the status of the secondary source here as an anonymous police informer. Although the difference is discussed expressly only in the dissenting opinion of Justice Harlan in *Harris,* at 29 L.Ed.2d 743, it is implicit in the Supreme Court's treating of *Aguilar-Spinelli* problems that the rules set out for establishing an informant's credibility are aimed primarily at unnamed police "informers" [6] rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers.[7] The members of this broad class are generally, but not universally,[8] named. They are not from the criminal milieu.

It was of this distinction that we spoke in *Dawson,* at 699:

> "The practical distinction is that in dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself), under the facts of a particular case, to establish the credibility of that source or the reliability of his information. *Kapler v. State,* 194 Md. 580; *Ward v. State,* 9 Md. App. 583, 591-592; *Grimm v. State,* 6 Md. App. 321, 328. See also *Taylor v. State,* 238 Md. 424; *Jones v. State,* 242 Md. 95; *Knight*

---

6. For an excellent discussion of the classes of police informers and their characteristics, see *Nutter v. State,* 8 Md. App. 635, p. 637, n. 1.

7. *United States v. Ventresca,* 380 U. S. 102, said flatly, at 111, that since IRS investigators are presumed to be truthful, a statement that information came from IRS investigators satisfies the reliability test. See also *Rugendorf v. United States,* 376 U. S. 528, and *Whiteley v. Warden,* 401 U. S. 560, for similar holdings with respect to other law enforcement officers.

8. See *Ventresca,* at 103, wherein the affidavit referred merely to "other Investigators attached to the Alcohol and Tobacco Tax Division," but did not identify them by proper names.

*v. State,* 7 Md. App. 282 (although these cases involve probable cause for warrantless arrests based upon hearsay information, the principle involved as to the trustworthiness of a witness-informant would also apply to cases involving applications for warrants)."

That a very different rationale exists for establishing the credibility of named citizen-informers than for establishing that of the more suspect and anonymous police-informer is widely acknowledged in recent case law. An excellent discussion of the different nature of the credibility problem is found in *People v. Glaubman,* 485 P. 2d 711 (Colorado, 1971), wherein it was said, at 716-717:

"She [a motel manager] was identified by name and is not on the same footing as the common informant who seeks to remain nameless and hidden and barters and sells information to the police. The nature of informants, which are a necessary part of police work, is such that the common informant is hidden behind a cloak of anonymity. . . . More often than not, the informant is paid or provides information in exchange for immunity from prosecution for his own misdeeds.

Our view, which is supported by a number of decisions, is that the citizen-informer, adviser, or reporter who acts openly to see that our laws are enforced should be encouraged, and his information should not be subjected to the same tests as are applied to the information of an ordinary informer." [9]

9. See also *Edmondson v. United States,* 402 F. 2d 809 (10th Cir. 1968); *Coyne v. Watson,* 282 F. Supp. 235 (D.C. Ohio, 1967); *People v. Hester,* 237 N.E.2d 466 (Ill. 1968); *People v. Lewis,* 240 Cal.App.2d 546; *State v. Paszek,* 184 N.W.2d 836 (Wis. 1971); *People v. Hoffman,* 258 N.E.2d 326 (Ill. 1970); *People v. Carter,* 253 N.E.2d 490 (Ill. 1969); *State v. Mazzadra,* 258 A. 2d 310 (Conn. 1969); *People v. Griffin,* 250 Cal.App.2d 545; *Walker v. State,* 196 So. 2d 8 (Fla. 1967) and *People v. MacDonald,* 480 P. 2d 555 (Colo. 1971) for explicit discussions of the difference.

The intrinsic approach to veracity is an alternative one in that *Aguilar* commands that the magistrate "be informed of some of the underlying circumstances from which the officer concluded that the informant" was "credible" *OR* "his information reliable." The Supreme Court, ironically, has never discussed the impact of the language, "or his information reliable." [10] Arguably, supporting facts which show that an informant's information is "reliable" thereby show also that the informant is, on that occasion at least, "credible." Unless the alternative phraseology is meaningless, the informant's "credibility" would seem to involve his inherent and ongoing character as a person—his reputation and demonstrated history of honesty and integrity. Informational "reliability," as something separate from its source's credibility, would seem to involve some circumstances assuring trustworthiness on the particular occasion of its being furnished. Although hypothetical examples are difficult to conjure up in the context of police informers, it would certainly follow that any circumstance qualifying as a trustworthy exception to the hearsay rule in a trial setting would, *a fortiori,* qualify in a probable cause setting. Fortunately, it is not this aspect of *Aguilar's* veracity prong which is before us in the case at bar.

With respect to the informant's "credibility," the recitation that his "reliability has been established in the past by the arrest of two persons for narcotics and one for burglary" creates an extremely close question in terms of its self-sufficiency under *Aguilar*. It is my judgment, however, that, although close, it falls short as being too conclusory in nature.

The recurring theme that comes resounding down through all of the Supreme Court decisions is that on

---

**10.** Some cases treat the "or his information reliable" aspect of *Aguilar's* veracity prong as something satisfied by the independent verification of the affiant's direct observations. This is contrary to the clear language of *Spinelli*. The "reliable information" test or aspect of a test is clearly part of *Aguilar*. *Spinelli* refers to independent verification as something "in addition to" *Aguilar* where *Aguilar* itself has not been satisfied, not as an alternative method of satisfying *Aguilar*.

every proposition, there must be an informed judgment made by the magistrate and not a mere conclusion offered by the policeman.

With respect to a somewhat lesser assertion, we said in *Iannone v. State,* 10 Md. App. 81, at 85:

> "We think it clear that an undisclosed informant's reliability is not established by the affiant's mere unsupported and unparticularized conclusory assertion that he has 'furnished information which has proven to be reliable in the past'."

See also *Lashley v. State,* 10 Md. App. 136, 139-140.

In asserting that the recitation here was too conclusory in nature, it is important to state what is not asserted. I do not suggest, by any means, that it fails simply because it recites that the information furnished in the past led to "arrests" rather than to "arrests and convictions." In *Watkins v. State,* 7 Md. App. 151, we held an assertion as to an informant's credibility to be sufficient under *Aguilar* where "arrests" rather than "arrests and convictions" were listed as the fruits of the confidential information. The significant difference is that in *Watkins,* the magistrate was furnished sufficient information to make a truly informed judgment. The information in that case was furnished in June, 1968. The affidavit recited that the informer was a narcotics user, long associated with narcotics peddlers and addicts in the Baltimore area. It recited that the informer had supplied reliable information to the police regularly since 1966. It recited that on two specific arrests made in March of 1968, three months prior, on the basis of information furnished by the informer, actual seizures were made of 77 capsules of heroin from the arrested individuals.

Just as in *Watkins* we held that an assertion about information leading to prior arrests may, if sufficiently particularized, be adequate, we held conversely in *Moore v. State,* 13 Md. App. 711, that an assertion that prior in-

formation led to "arrests and convictions" may, if not sufficiently particularized, be inadequate. Judge Orth there held that the recitation that "reliable" informants had furnished "information in the past which resulted in arrests and convictions for violations of the narcotic laws" was insufficient for lack of specificity. He said:

> " 'Over the past' and 'in the past' could be the distant past or the immediate past or sometime in between. It does not follow that because an informant gave a tip years or even months ago which proved reliable, that he is forever after credible. Nor do we think it enough that this information given at some undetermined time resulted in arrests and convictions for violation of the narcotics laws. We do not say that such facts must be so detailed as would compromise the identity of the informant but we think more specificity than here presented is required, at the least as to about when past information was received and about how many arrests and how many convictions resulted therefrom."

The recitation as to the informant's past performance in the case at bar did not give the magistrate the data on which to base an informed judgment, notwithstanding the allegation as to "arrests." It did not tell the magistrate when that information had been furnished. It did not tell the magistrate whether, as a result of the arrests, evidence was turned up which the informant indicated would be turned up. It did not tell the magistrate whether the information from the informant was the exclusive predicate for the arrests, or whether it was but a minor contributing factor considered along with many other factors. It did not tell the magistrate whether those earlier arrests had ever been ruled upon, in terms of their legality and the adequacy of the probable cause upon which they were based. If the informant was, indeed, deemed reliable for purposes of those earlier arrests, what were the supporting facts which made him

reliable then? That data would have been additionally significant for the magistrate here. The magistrate here was not even told whether the informant here had always furnished good information or not. In that last significant regard, *People v. Cruz,* 53 Cal. Rptr. 354, provides a commendable benchmark. In that case, the affidavit recited:

> "Affiant received information from a confidential reliable informant who has furnished information in the past that has resulted in the arrest of 7 persons, 6 for 11500 H&S, and one for violation of parole. These cases are still waiting adjudication in Los Angeles courts. Informant has never given information which proved to be incorrect."

If the furnishing of good information in the past contributes to a belief in an informant's credibility, the furnishing of bad information in the past would certainly derogate therefrom. The policeman who works with an informant knows of his full batting average, not just of his successes. If a magistrate is furnished, selectively, with half-truths, he is intellectually crippled in terms of making the informed judgment contemplated by the Fourth Amendment.[11]

Police compliance need not be difficult, if the spirit of *Nathanson-Giordenello-Johnson-Aguilar-Spinelli* is once understood and appreciated. In permitting hearsay information from unnamed informants to serve as a significantly contributory, and even self-sufficient, basis for probable cause, the Constitution is realistically extending great latitude to law enforcement. When a magistrate is asked, therefore, to dispense with the oath, with

---

11. It is not being overly cynical to suggest that in some instances, the sparsity of information about an informant's credibility is prompted not by fear of compromising his identity but by fear that the policeman doesn't really have a "substantial basis" for trusting his informant. In such cases, the magistrate should not be asked to rely upon that which the policeman himself cannot really rely upon.

personal observation and even with the identity of the source of the ultimate information, upon which he must act, it is only a realistic substitute to require that the policeman make a bona fide effort to furnish in significant detail those reasons the policeman has for believing in his informant.

In this regard, the affidavit deemed sufficient by us in *Holland v. State,* 13 Md. App. 635, is a model for the careful and meticulous detail which can go into demonstrating the credibility of an unnamed informant.

In his dissenting opinion in *Harris,* Justice Harlan discussed the types of information which enter into the judgments of the policeman, and should, therefore, be passed on to the magistrate:

> "Without violating the confidences of his source, the agent surely could describe for the magistrate such things as the informer's general background, employment, personal attributes that enable him to observe and relate accurately, position in the community, reputation with others, personal connection with the suspect, any circumstances which suggest the probable absence of any motivation to falsify, the apparent motivation for supplying the information, the presence or absence of a criminal record or association with known criminals, and the like."
> *Harris,* 29 L.Ed.2d at 743.

The phrases "information that has led to arrests" or "information that has led to arrests and convictions" are not significantly less conclusory than such other phrases as "proved to be reliable" or "found by me to be credible." The hard lesson for police is that there are no magic words. There are no ritualistic incantations which, once discovered, will serve to satisfy reviewing courts. Rather on a case-by-case basis, the magistrate must be assisted to make an informed judgment as to why a particular informant is probably trustworthy. For such judgment, there is no mechanical formula. The factors

that lead one man to believe that another man is telling the truth are as varied as the experiences of Mankind itself.

Properly to inform the magistrate, a policeman should pass on all he knows about his informant, short of compromising the informant's identity, and that should include the informal data which is perhaps more significant than the formal data. It is not *reductio ad absurdum* to suggest that if a policeman has habitually trusted his informant with his automobile, his wallet or his wife, let the magistrate be told; if the informant has powerful religious scruples against bearing false witness, let the magistrate be told; if the informant once confessed to chopping down his father's cherry tree, let the magistrate be told. This, and not the incantation of hopefully magic words, is the stuff of which informed judgments must be made.

My feeling that the recitation here, although close, fell just short of *Aguilar's* threshold, would not estop further inquiry into the informant's credibility. We would then have to explore the extrinsic route to the establishment of veracity. This is the alternative probable cause device, set out in *Spinelli*, whereby independent police or other credible observations may verify or corroborate so much of an informant's story as to lend credence to the rest of it and so raise it above *Aguilar's* threshold, even where the information initially furnished about the informant or the circumstances of his giving the information was intrinsically inadequate to pass muster. *Spinelli* described this buttressing technique, at 415-416:

> "If the tip is found inadequate under *Aguilar*, the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when

certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration? . . .

A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which—even when partially corroborated—is not as reliable as one which passes *Aguilar's* requirements when standing alone."

See also *Dawson, supra,* at 703.[12]

The informant had, *inter alia,* asserted that the appellant was "dealing Dilaudid from his auto, a Black Ford approximately a 1963 model in the area of Ponca and Eastern Ave. in Baltimore City." The independent observations of the police-affiant established that "this Black 63 Ford [was seen] in the area of Ponca and Eastern Ave. in Baltimore City on numerous occasions at approximately nine PM," and further that the appellant himself was seen in a 1960 Lincoln "in the area of Ponca and Eastern Ave. on one occasion." Independent police investigation established that the black Ford automobile in question was registered to a "Norma A. Dawson," who was listed as living at the same address as was the appellant.

I feel that the assertions made here about the informant's credibility, buttressed by the corroboration of part of the informant's story by independent police observation, is as trustworthy as an assertion which would pass *Aguilar's* test without independent corroboration. The verification here was slight, but only slight verification was required.

This case contrasts significantly with *Spinelli,* wherein the independent police observations were far more extensive than were those here. The critical distinction is that here only a little by way of "further support"

12. The notion that corroboration of a tip can establish the reliability of an informant's information is derived from *Draper.*

was required, whereas in *Spinelli* the even more extensive independent observations were not enough to salvage an initial assertion as to the informant's credibility which was so inadequate under *Aguilar* as to be nugatory.