506 A.2d 255

**Stephen  Alexander  TRUSSELL**

v.

**STATE  of  Maryland.**

**No.  204,  Sept.  Term,  1985.**

Court  of  Special  Appeals  of  Maryland.

April  2,  1986.

Certiorari  Denied  June  26,  1986.

**24**

Peter M. Levin, Assigned Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Joseph I. Cassily, State's Atty. for Harford County and Gerard S. Comen, Asst. State's Atty. for Harford County, on brief, Bel Air), for appellee.

Submitted before MOYLAN and ROBERT M. BELL, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

MOYLAN, Judge.

The appellant, Stephen Alexander Trussell, was convicted by a Harford County jury, presided over by Judge Cypert O. Whitfill, of 1) possession of cocaine with intent to distribute; 2) possession of marijuana; and 3) possession of LSD. Upon this appeal, he raises five contentions:

1) That the judge, having earlier issued the search warrant, should have recused himself from ruling on the suppression motion;

2) That the affidavit in support of the search warrant did not demonstrate probable cause;

3) That the evidence was not legally sufficient to sustain the convictions;

4) That a mistrial should have been declared when a question from a juror demonstrated prejudice on the part of that juror; and

5) That the judge prejudiced the jury when he redefined a question asked by the jury and volunteered an answer that went beyond the question.

### Competence of Warrant-Issuing Judge to Hear Suppression Motion

The appellant's first claim is that Judge Whitfill was guilty of an abuse of discretion when he refused to recuse himself from ruling on the appellant's motion to suppress physical evidence. It was Judge Whitfill who issued the search and seizure warrant on June 5, 1984. It was Judge Whitfill who presided over the suppression hearing, challenging that warrant, on October 10, 1984.

The unilluminating, single-paragraph challenge to the failure of Judge Whitfill to recuse himself is devoid of any citation to case authority or legal treatise whatsoever. There is simply the bald assertion that "it would be virtually impossible to be objective where he was sitting on an appeal of his own decision that the warrant was valid on its face." Notwithstanding the skimpiness of the challenge, it

is an important issue that could recur and is, therefore, worthy of more than summary resolution.

Precisely the same challenge was before the Court in *Peaper and Lowe v. State,* 14 Md.App. 201, 208, 286 A.2d 176 (1972), *cert. denied,* 409 U.S. 987, 93 S.Ct. 342, 34 L.Ed.2d 253, where both appellants contended "that they were denied due process of law because the trial judge who reviewed the validity of the search warrant was the very judge who had issued that warrant in the first instance." Our literal holding in that case was that the point had not been preserved for appellate review under Maryland Rule 1085. By way of deliberate and well-considered *dicta,* however, we indicated that we would have found the contention without merit if it had been properly before us. We stated unequivocally, at 14 Md.App. 209, 286 A.2d 176:

> "[A]bsent a showing of bias or prejudice, the mere fact that a judge issued the warrant would not preclude him from sitting either at a suppression hearing dealing with that warrant or at the trial upon the merits."

We looked, by way of analogy, to the landmark decision of the Court of Appeals in *State v. Hutchinson,* 260 Md. 227, 271 A.2d 641 (1970). Although involving the impact of knowledge of a confession upon the capacity of a judge to be a neutral fact finder, the analysis of the Court, in holding that a judge was not thereby disqualified, was one that "goes to the very marrow of the role, function, and capacity of the judge in our legal system." *Id.* We went on to consider the persuasive authority from sister jurisdictions, summarizing that authority at 14 Md.App. 209–210, 286 A.2d 176:

> "Although only implicit in the Maryland case law, the issue has been resolved directly and explicitly that a judge is not disqualified from later participation in a case, even where the suppression of physical evidence is the key issue, by virtue of the fact that he issued the search and seizure warrant. *Waupoose v. State,* [46 Wis.2d 257], 174 N.W.2d 503, 504 (Wisc.1970); *Arnold v. Commonwealth,* 421 S.W.2d 366, 366–367 (Ky.1967); *State ex*

*rel. French v. Hendricks Superior Court,* [252 Ind. 213], 247 N.E.2d 519, 525 (Indiana 1969); *State v. Smith,* [113 N.J.Super. 120], 273 A.2d 68, 78 (N.J.1971); *State v. Toce,* [6 Conn.Cir. 192], 269 A.2d 421, 422–423 (Conn.1969); *Irwin v. State,* 441 S.W.2d 203, 208–209 (Texas 1969)."

Indeed, the same principle manifests itself in a wide variety of applications. Whenever a judge is called upon to reconsider an earlier ruling and most of the time when a judge is asked to render a judgment n.o.v. or to grant a motion for a new trial, the judge is being called upon to review and possibly to reverse an earlier decision made by that judge. It has never been held that there was any conflict of interest or other impropriety in such situations.

We can find no dissenting voice from the broad consensus that a judge, in issuing a search warrant, is not thereby disqualified from presiding over the suppression hearing which will review that warrant. In *Hawkins v. State,* 586 S.W.2d 465 (1979), the Supreme Court of Tennessee held that a statute that authorizes a judge to hear a challenge to the warrant which he earlier issued is not unconstitutional. In *United States v. Cansdale,* 7 M.J. 143 (C.M.A.1979), the United States Court of Military Appeals surveyed both the state and federal case law and concluded, at 145, that "many cases approve the concept that a trial judge is not disqualified merely because he must rule upon the validity of a search conducted pursuant to a warrant issued by him." It found no case holding to the contrary. In *State v. Smith,* 113 N.J.Super. 120, 273 A.2d 68 (1971), the New Jersey Appellate Division not only approved the procedure but explained the different natures of the two judicial determinations, at 273 A.2d 78:

"The action in issuing the warrant is *ex parte* and merely appraises the *prima facie* showing of probable cause. The motion proceeding is adversarial, and the judge adjudicates all questions of law and fact posed on the challenge of the validity of the warrant."

*See also State v. Cooper,* 52 Ohio St.2d 163, 370 N.E.2d 725 (1977), *vacated in part on other grounds, Cooper v. Ohio,* 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157 (1978).

What is required for a judge to be compelled to recuse himself is the presence of bias. An excellent analysis of bias, as a term of art within the contemplation of recusal requirements, is found in *United States v. Garramone,* 374 F.Supp. 256, 258 (E.D.Pa.1974):

"The facts do not establish any personal bias or prejudice on the part of this Court.... The affidavit must establish a bias or prejudice of an extra-judicial origin, a bias that has been acquired outside the four walls of the courtroom. Adverse judicial rulings or prior judicial exposure to the parties or questions are not sufficient to establish personal bias or prejudice."

*See also State v. Toce,* 6 Conn.Cir.Ct. 192, 269 A.2d 421, 422 (1969).

As but a slight variation on the same theme, a number of state court decisions have held that a judge, by virtue of having issued the search warrant in the case, is not thereby disqualified from presiding over the trial upon the merits. *State v. Brown,* 20 N.C.App. 413, 201 S.E.2d 527 (1974); *State v. Knoblock,* 44 Wis.2d 130, 170 N.W.2d 781 (1969); *State ex. rel. French v. Hendricks Superior Court,* 252 Ind. 213, 247 N.E.2d 519 (1969); *Sanders v. State,* 649 S.W.2d 59 (Tex.App. 1st Dist.1982), *overruled on other grounds,* 658 S.W.2d 572, 580 (Tex.Crim.App.1983).

The only qualification on this eligibility of the warrant-issuing judge to sit at later stages of the same case is the rare situation dealt with in *Coslow v. State,* 490 P.2d 1116 (Okla.Crim.App.1971). Where the warrant-issuing judge is going to be called as a witness in a subsequent proceeding, his status as a witness dictates that another judge should be assigned to hear the case. Judge Whitfill was not called as a witness in the case now under review.

■ We hold that the fact that a judge has issued a warrant does not disqualify that judge from presiding over

a subsequent suppression hearing involving the validity of that warrant. Under the circumstances, Judge Whitfill obviously committed no error.

### Probable Cause for the Search Warrant

The appellant next complains that Judge Whitfill erroneously failed to suppress all of the physical evidence. The search and seizure in question was executed pursuant to a warrant that had been issued by Judge Whitfill on June 5, 1984. Even if the warrant had been technically lacking in probable cause, the reliance of the executing officers upon the presumptive validity of the warrant would have exempted the search from the sanctions of the Exclusionary Rule. *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

■ The warrant was not, however, deficient. Under the "totality of circumstances" approach for reviewing warrants now mandated by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the reviewing judge does not (at the suppression hearing level or at the appellate level) make a *de novo* determination of probable cause but simply determines whether there was a "substantial basis" for the warrant-issuing magistrate's determination that probable cause existed. *Illinois v. Gates* substituted this looser approach for the earlier and more rigorous "two-pronged test" of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The warrant application before us, however, would have passed muster even under the more rigorous standard. *A fortiori,* it is good under the less demanding standard.

A word about *Aguilar* and *Spinelli* is appropriate. As valuable case law, they are not dead. They have simply been reduced from "constitutionally binding" stature to "helpful guidelines" stature. *Illinois v. Gates* determined that it was inappropriate, on the probable cause issue, to

insist that the rigorous standards mandated by *Aguilar* and *Spinelli* and their progeny be rigidly applied. The flexibility of the "totality of circumstances" approach was more desirable in assessing these *ex parte* decisions that are but part of the preliminary, investigative process. The analytic framework provided by *Aguilar* and *Spinelli*, however, continues to be of service in helping judges to understand what they should look for as they review a warrant application in the first instance. As was discussed in R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1985 Supp.), at 40–41:

"The Supreme Court made it very clear, however, that 'an informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report.' The thrust of the change wrought by the *Gates* decision was to avoid treating 'veracity' and 'basis of knowledge' as 'entirely separate and independent requirements to be rigidly exacted in every case.' In place of 'rigid compartmentalization of the inquiries,' the Court directed that these questions 'be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.' As an aid, therefore, in understanding the nature and purpose of the magistrate's inquiry, [*Aguilar* and *Spinelli*] should continue to provide that 'useful illumination' referred to by the Supreme Court."

*Aguilar*'s "veracity prong" dealt with the issue of what it was in a warrant application that might persuade the warrant-issuing judge that a police officer's secondary source was worthy of belief. A big distinction in that regard was whether the secondary source (sometimes called the informant) was from the criminal milieu, and therefore inherently suspect, or was a citizen-informant, whose very status militated toward a finding of trustworthiness. In this case, two of Corporal Bane's sources were described as "concerned citizen-informants" who "wished to remain anony-

mous." Corporal Bane elaborated further on the status of these two sources as citizen-informants:

"The two concerned citizen-informants are both members of the West Riding Community, United States and Maryland citizens, hold full-time jobs, are on the Harford County Voters' Register and do not have any criminal record. Neither of the concerned informants is receiving any compensation or remuneration for this information."

We spoke of the inherent credibility of the citizen-informant, as contrasted with the more suspect police "stool pigeon," in *King and Mobley v. State*, 16 Md.App. 546, 554–555, 298 A.2d 446 450 (1973):

"It was made clear in *Dawson v. State*, 14 Md.App. 18, 33–34, 284 A.2d 861, that the strictures of *Aguilar v. Texas*, 378 U.S. 108 [84 S.Ct. 1509], and *Spinelli v. United States*, 393 U.S. 410 [89 S.Ct. 584], 'are aimed primarily at unnamed police "informers" rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers. The members of this broad class are generally, but not universally, named. They are not from the criminal milieu.' *Dawson*, [14 Md.App.] p. 33 [284 A.2d 861]."

In terms of what *Aguilar-Spinelli* dubbed the "veracity prong," the two citizen-informants posed no problem.

Of minimal significance but throwing some light on the general behavioral pattern of the appellant, the two citizen-informants revealed that they had been at a party at the appellant's residence "three or four years ago" when the appellant openly stated that "if anyone wanted to smoke pot," the marijuana was upstairs. This information, of course, was the product of direct observation. More significantly, one of the citizen-informants had been in more recent conversation "with a number of neighborhood teenagers." The teenagers reported that the appellant "was selling marijuana and possibly cocaine." The two citizen-informants, moreover, described the appellant's automobile

and the two Bel Air restaurants and taverns frequented by the appellant.

Corporal Bane directly undertook undercover surveillances at both of the described restaurants. At the Georgetown North, he observed the appellant and another white male involved in conduct which, based upon his experience and expertise, appeared to be "setting up and carrying out of a drug deal." At Rafferty's Pub, Corporal Bane, posing as a knowledgeable customer, heard from a white female in the bar that the appellant "threw some good parties." The white female elaborated by saying that there was "plenty of 'stuff' set out all over the place at these parties." She went on to define "stuff" by holding one finger over her right nostril as though she were snorting cocaine. With no idea that she was talking to a policeman, this unnamed female had no apparent motive to fabricate and passed on the information under circumstances reasonably assuring reliability.

Most significant was the undercover work of Trooper First Class Michael Heise. On five occasions spread throughout the month of May, 1984, Trooper Heise made attempts to purchase cocaine from a Martin Lee Via and his wife, Donna Jean Via. Of great significance were the discreetly observed actions of the Vias as those actions corroborated statements made by both of the Vias to Trooper Heise. In terms of the veracity of those statements, we are dealing with a situation indistinguishable from that before us in *Thompson v. State*, 16 Md.App. 560, 298 A.2d 458 (1973). Two sellers of narcotics were dealing with an obviously trusted "purchaser" of narcotics. There was no reason whatsoever for them to fabricate to him about their source of supply. Their behavior in attempting to come up with the drugs, out of the presence of Trooper Heise but covertly observed by a police surveillance team, corroborated fully their statements to Trooper Heise about the source of supply. With respect to their veracity under these circumstances, we feel as we did in *Thompson v. State, supra,* at 16 Md.App. 567–568, 298 A.2d 458:

"Though from the criminal milieu, to be sure, he was not, wittingly at least, working with the police. He was not in the position of 'the common informant . . . hidden behind a cloak of anonymity' who more often than not 'is paid or provides information in exchange for immunity from prosecution for his own misdeeds.' *People v. Glaubman,* [175 Colo. 41], 485 P.2d 711, 716–717 (Colorado, 1971). This street seller was, so far as he knew, engaged in a purely commercial venture for his own profit. He was dealing with a regular and presumably valued customer. Being unable initially to satisfy his customer's demand, it was to his every advantage to assure the prompt return of that customer as soon as fresh merchandise was available for sale. He simply had no purpose in misleading his own clientele. The circumstances in which the seller passed on the information to a customer and confidant are replete, we think, with reasonable assurances of trustworthiness."

On five separate occasions throughout the month of May, Trooper Heise attempted to purchase cocaine from either Martin or Donna Via. On most of those occasions, the Vias left Heise's presence in order to go and get the cocaine from their "supplier," referred to as "Steve." Unknown to the Vias, there were discreet surveillances conducted on their movements. They were observed to make no less than six trips to the home of the appellant. The five attempted purchases of cocaine resulted in cocaine actually being supplied twice, indications on two other occasions that the supplier was either "tapped out" or out of town, and an alternative purchase suggested on the fifth occasion—Heise was told that the source was out of cocaine but would be happy to supply "acid." On the occasion of the final attempted purchase, Heise himself was permitted to accompany the Vias to the outside of the appellant's home, from which vantage point he could observe certain pedestrian and vehicular traffic.

Notwithstanding the appellant's protest that several of these attempted purchases of cocaine were fruitless and,

therefore, innocuous, the representations of the Vias, strongly corroborated by their actions, were just as probative in establishing the appellant and his home as "the source" as would have been the case if all of the attempted purchases had been consummated.

■ The warrant application in this case amply demonstrated probable cause for the issuance of the warrant.

### Legal Sufficiency of the Evidence

■ The appellant's contention with respect to the legal insufficiency of the evidence is absurd. The thrust of the contention is that the largest single package of cocaine was found in the jacket pocket of Norman Thomas and not in the direct possession of the appellant. The contention conveniently ignores numerous other items of contraband throughout the appellant's house, just as it conveniently ignores the evidence that Norman Thomas was the appellant's "connection" and was in the appellant's house for purposes of making a major delivery of cocaine to the appellant. In terms of the law of possession, moreover, the appellant also conveniently ignores the well-established principle of *Folk v. State*, 11 Md.App. 508, 511–512, 275 A.2d 184 (1971):

> "It is well-settled that the proscribed possession of marihuana or of narcotic drugs under the Maryland law need not be sole possession. '[T]here may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title.' *Jason v. State*, 9 Md.App. 102, 111 [262 A.2d 774 (1970) ] . . . .
>
> Nor is it necessary, in order to be found in joint possession of a contraband drug, that the appellant have a 'full partnership' in the contraband." (Citations omitted).

In *Folk*, we went on to discuss, at 11 Md.App. 518, 275 A.2d 184, the circumstances which could help to demonstrate that

a party, not in direct physical possession, could nonetheless be found guilty of joint possession:

"The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband."

Measured against those criteria, the evidence of guilt in this case is overwhelming. The search, executed pursuant to a warrant a few minutes after midnight on the morning of June 9, 1984, was of the home of the appellant. For purposes of assessing the legal sufficiency of the evidence, we will, of course, assume that the search was constitutional. At the outset, we note that when the police rapped upon the door and announced their identities as officers, the appellant attempted to bar the door, and the police had to push it open by overcoming his resistance. That, by way of initial coloration, is circumstantial evidence of consciousness of guilt.

From the appellant himself was seized $733 in cash and a small glass vial containing cocaine residue. The Zip-Loc bag seized from the jacket of Norman Thomas contained 116.2 grams of cocaine of a 77% purity level. This batch of cocaine was estimated to have a value of approximately $11,000 in that condition. Corporal Michael Callahan testified further that cocaine of that purity could be cut again and would thereby take on a street value of at least $23,000.

Other batches of cocaine, cocaine residue, paraphernalia for both using and packaging cocaine, marijuana and LSD, were found throughout the appellant's house. Recoveries of evidence were made from the dining room, from the kitchen, from the appellant's master bedroom, from the

appellant's nightstand, from the appellant's wall safe, and from the den. The physical evidence alone abundantly supported the verdicts. But the physical evidence was far from the entire State's case.

Testifying for the State pursuant to a plea bargain was Barbara Lee Stone, a social friend of the appellant, who was present at the time of the search. Ms. Stone testified that over the course of two days the appellant bragged about his "New York connection." When, in the course of a dinner conversation, she asked him where he got his money, he replied that he "made a lot of money selling cocaine." She then asked him where Lynn, his former live-in girlfriend, had gotten her money; the appellant replied that he paid Lynn "$500 a week because she got him a connection in New York."

Earlier on the day of the search, Barbara Stone heard the appellant's end of a conversation in which he made arrangements for the cocaine delivery to his home that night. Numerous references were made directly to Barbara Stone and to two other social friends in her presence about "the connection."

Corporal Callahan questioned the appellant the next morning. The appellant acknowledged knowing there was marijuana in the house and further stated that there had been LSD in his freezer "since Christ was a kid." He denied knowledge of the cocaine, however. When Corporal Callahan then told the appellant that the police knew he was expecting a delivery of cocaine from New York that night and theorized that perhaps the appellant had not yet physically seen it, the appellant replied, "Yeah, but I don't think I'd better say anything else." The appellant paused and went on, "You got it, you know what went on."

The appellant did not take the stand to testify in his own defense.

It is to state the self-evident to hold that the State established a legally sufficient, *prima facie* case of guilt.

*Williams v. State*, 5 Md.App. 450, 459, 247 A.2d 731 (1968); *Metz v. State*, 9 Md.App. 15, 23, 262 A.2d 331 (1970).

### The Attributes of a Good Juror

On the second day of the trial, Judge Whitfill somehow received a note from one of the jurors indicating that that juror was curious to know the appellant's place of employment and his source of income. The appellant moved that a mistrial be declared or, in the alternative, that the juror be excused. Judge Whitfill denied the motion in both of its manifestations.[1]

In support of his contention that the juror was demonstrably incompetent to serve, the appellant offers neither case law nor argument. He makes only the bald assertion that the question "demonstrated prejudice because the juror was already thinking in terms of appellant's making a living from the distribution of drugs."

■ Quite to the contrary, we think the juror in question was demonstrably a model juror. Though the jury collectively is routinely admonished not to undertake discussion or analysis of the case until the entire case is submitted to them for final deliberation, this by no means implies that individual jurors should not get their minds in gear at a much earlier stage. Neither law nor logic suggests that individual jurors should not begin to think, to assess credibility, to pose questions to themselves, to frame hypotheses, to theorize, and to begin the process of appraising the evidence on a tentative basis, provided always that the process be kept open for continuing reappraisal. The question here was a bright and insightful question, of a type that any curious and dedicated juror should have been

---

1. Evidence with respect to the appellant's source of income did come out later in the trial. A defense witness, on the one hand, testified that the appellant supported himself by selling burglar alarm systems. Ms. Stone, on the other hand, testified that the appellant, by his own admission, made "a lot of money selling cocaine."

asking. It raised a natural inquiry as to which members of this Court would have been interested in knowing the answer, had we been on the jury. The law neither demands nor expects that jurors, well into the trial process, should have minds that are total blanks. That would be a sign of imbecility. Interest, alertness, and curiosity are indeed the attributes of the model juror.

### *Reinstruction in Response to Jury Question*

During the course of its deliberations, the jury passed a question out to the judge. The judge received it in the presence of and with the full knowledge of counsel. Although the question was inartfully phrased, it apparently sought the significance of the appellant's knowledge that "the man from New York" was at the appellant's house and was a distributor and whether that, in turn, indicated that the appellant was a distributor. The judge pointed out that the issue before the jury was not whether the appellant was, on the facts of this case, a distributor, but whether he possessed drugs with intent to distribute. He distinguished quite properly between possession intended for private consumption and possession with intent to distribute. The foreman indicated that the jury was satisfied with the answer, and the jury resumed its deliberations. The appellant did not object until after the jury had retired to the jury room. Even then, as on this appeal, the objection was not that the court's response was incorrect but that the judge had not cleared it with counsel in advance. Maryland Rule 4–326(c) only requires the court to notify counsel that there has been a communication; it does not require the judge to submit a draft of his reply to counsel for their approval. We see no remote error. Indeed, the instruction must have been helpful, for the jury returned with its verdicts approximately two minutes after having received it.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.