578 A.2d 816

**Maurice Jerome SNOW**

v.

**STATE of Maryland.**

**No. 1713, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 4, 1990.

Melissa M. Moore, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief, Baltimore, and John L. Scarborough, State's Atty. for Cecil County, Elkton, on the brief), for appellee.

Submitted before ROSALYN B. BELL, KARWACKI, and JAMES S. GETTY (retired), Specially Assigned, JJ.

ROSALYN B. BELL, Judge.

The Fourth Amendment states that the

"right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." [1]

Distinguishing a "stop" from an "arrest" and a "frisk" from a "search," the Supreme Court of the United States created the "reasonable suspicion" standard in order to deal

---

1. *See also* Constitution of Maryland, Declaration of Rights, Art. 26, which has been held to be in *pari materia* with the Fourth Amendment.

"with the rapidly unfolding and often dangerous situations [that police encounter] on city streets[.]" *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884, the Supreme Court held, *inter alia:*

> "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous ...,"

he may "stop" the suspect and make "reasonable inquiries."

The sole issue involved in this appeal is whether the police officer had "a reasonable and articulable suspicion" to support the detention of a driver after issuing a warning ticket for speeding. The observed facts upon which the officer based the articulable suspicion were: (1) the driver's lack of eye contact with the officer; (2) driving on a major interstate route which the officer knew to be a drug route; (3) the presence of three air fresheners in the driver's car; and (4) the driver's refusal to consent to a search of his vehicle.[2] We hold that the police officer may not consider the last of the four "facts" to support the "reasonable suspicion" and that the first three do not create a "reasonable suspicion" to detain a driver after the purpose of the initial stop had been fulfilled. Consequently, the evidence recovered should have been suppressed.

### FACTS

Just past noon on April 4, 1989, Maurice Jerome Snow, appellant, who was driving a 1983 Chevrolet Blazer, was stopped on Interstate 95 by Trooper First Class Nicholas Paros. Paros saw the car cross the state line from Delaware into Maryland at what he believed to be an excessive rate of speed. He followed the Blazer and clocked its speed at 64.1 miles per hour in 55 mile-per-hour zone. When

---

2. The record indicates the occupants were black. The State makes no claim that this fact contributed to the officer's thought processes.

stopped, Snow, produced a driver's license and temporary registration, and admitted to driving at 58 miles per hour. Paros stated that Snow "seemed somewhat nervous and was not making any eye contact with me."

There is some discrepancy regarding when Paros asked Snow where he was going: Paros claims at this point, while Snow maintains that Paros asked after he gave him a warning. In any event, Snow replied that he and his passenger, Carl Davis, were coming from Philadelphia and going to northeast Washington, D.C., to see Davis's girl-friend. Paros was aware that reports showed that controlled dangerous substances were moving from the Philadelphia area to that part of Washington, D.C. Paros also noted three air fresheners hanging from the rear view mirror. Paros testified that from his experience air fresheners were "one of numerous concealment methods that smugglers use;" and that air fresheners were "sometimes ... used as a concealment method to hide odor ... for narcotics."

Paros at some point asked both men to exit the car and move over to the grass, but he admitted he was not sure when this occurred. Corporal Eric Danz testified, however, that when he came upon the scene he saw Paros talking to the two men seated at a table outside the car. Paros then told Danz he was going to do a drug scan. After Paros issued a traffic warning to Snow, he then requested permission to search the Blazer. Snow refused. Paros used a K–9 dog to scan or sniff the exterior of the Blazer.[3] After

---

3. The K–9 dog used by Paros was a black Labrador retriever named Rocky. On examination by the trial court, Paros testified that Rocky had to be "90 percent proficient with no false alerts to graduate" from the basic detection course, which he accomplished. Paros further testified that he and Rocky attended the quarterly recertification classes and that Rocky was recertified at the time of this incident. On cross-examination, defense counsel did elicit testimony from Paros which showed that Rocky had been falsely alerted to a bag of quinine, which is used as a cutting agent, in connection with another case. Thus, out of the 49 times Rocky had been used in stops for drugs, he had one false alert.

sniffing a portion of the car, the dog sat down, which according to Paros, signaled an alert that drugs were present. Paros returned the dog to the patrol car and watched Snow and Davis while Danz searched the Blazer and recovered suspected heroin from three bags within an overnight bag in the rear of the Blazer. Paros arrested Snow and Davis and advised them of their rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Snow was charged with one count of smuggling heroin into the State, two counts of possession of heroin, and one count each of conspiracy to smuggle and to distribute heroin. He was tried on an agreed statement of facts, found guilty of possession of heroin (the other counts were nolle prossed) and sentenced in the Circuit Court for Cecil County to two years with credit for 224 days, all suspended in favor of two years supervised probation. Snow appeals, contending the trial court erred in denying his motion to suppress the evidence. We agree with Snow and reverse the judgment.

## SEQUENCE OF EVENTS

There can be no doubt, and Snow does not contest, that the initial stop was justified, as Snow was admittedly exceeding the speed limit. But the purpose of the initial stop was fulfilled when Paros issued the warning. We agree with the State that, if Paros properly and constitutionally conducted the scan or sniff of the perimeter of the car using his trained dog, the dog's responses could be held to provide probable cause to search the interior of the car. *See Florida v. Royer*, 460 U.S. 491, 505–06, 103 S.Ct. 1319, 1328–29, 75 L.Ed.2d 229 (1983); *Grant v. State*, 55 Md.App. 1, 14–15, 461 A.2d 524 (1983), *cert. dismissed*, 299 Md. 309, 473 A.2d 455 (1984). But the doubt in this case focuses on the legality of Paros's detention of Snow and Davis in order to scan the vehicle after having issued the warning for speeding.

Directing our attention to that time frame, the State does not contend that Paros had probable cause to arrest Snow

when he asked to search the car. Rather, the State relies on the "articulable suspicion" standard first recognized in *Terry v. Ohio*, which is "less than probable cause, but more than a mere inarticulable hunch." Gilbert & Moylan, *Maryland Criminal Law: Practice and Procedure*, § 33.1 (1983).

## Seizure

Initially, we must determine whether Snow was, in fact, seized for purposes of the Fourth Amendment. In *State v. Lemmon*, 318 Md. 365, 568 A.2d 48 (1990), the Court of Appeals analyzed two recent United States Supreme Court decisions in this area. The Court noted that the standard used to determine whether an individual is seized is that "whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Lemmon*, 318 Md. at 375, 568 A.2d 48, citing *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 1380, 103 L.Ed.2d 628 (1989), quoting *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). The Court of Appeals also stated that *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), "declares that the test to be applied in determining whether a person has been 'seized' within the meaning of the Fourth Amendment is whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Lemmon*, 318 Md. at 372, 568 A.2d 48.

## The Case Law

## Federal

The nature of *Terry* and the reasonable, articulable suspicion standard is such that a brief review of the cases, both federal and Maryland, is necessary. The circumstances of *Terry* were very different from the facts in the case at bar. In *Terry*, a police officer noticed two men acting suspiciously in front of a store at a time when the store was not open to the public. Moreover, the police officer had reason to

fear for his own safety since he thought the suspects were carrying guns. The *Terry* Court upheld the admission of the guns into evidence at the defendants' trial on that basis. Subsequently, the Court arguably limited the impact of *Terry* solely to the search for weapons.[4] *See Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

Two cases involving cars, which further developed the doctrine of the intrusion based on the *Terry* stop, have been decided by the United States Supreme Court. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), two police officers observed a car traveling erratically and at excessive speed. The car went off the road and landed in a ditch. The police approached and saw the suspected drunk driver standing at the rear of the vehicle. Through the open left door they saw a hunting knife on the floor of the car. The officers frisked the suspect. The frisk was upheld as a valid search to protect themselves based on the "plain view" sighting of the knife.

In *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), the police stopped a vehicle because its license plates had expired. They ordered the driver to get out of the car, which was considered a *de minimis* additional intrusion requiring no independent justification. *Mimms,* 434 U.S. at 111, 98 S.Ct. at 333. The subsequent patdown, however, was a separate and distinct intrusion which required separate justification. In *Mimms,* the patdown was justified by the "bulge" in the driver's jacket which gave rise to a reasonable and articulable suspicion that the driver was armed.

---

**4.** Thus, the *Terry* line of cases may not be the most appropriate to this case where the search was for drugs, not weapons. But the State could make no other argument since the automobile exception, first espoused in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), requires probable cause as well as exigent circumstances, *Jarrell v. State,* 36 Md.App. 371, 373, 373 A.2d 975, *cert. denied,* 281 Md. 739 (1977), and on appeal the State concedes that there was no probable cause.

Most of the case law in the area of what facts are required in order to meet this "reasonable, articulable suspicion standard" has dealt with drug couriers in airports. *See United States v. Sokolow,* 489 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality); *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

The law enforcement agents in *Sokolow* knew that the suspect: (1) had paid $2100 cash for two airplane tickets from a roll of $20 bills; (2) was traveling under a name which did not match the name under which the telephone number he gave to the airline ticket agent was listed; (3) was going to Miami, a source city for drugs; (4) stayed in Miami for only 48 hours, though the round-trip flight from Honolulu to Miami takes 20 hours; (5) was very nervous; and (6) checked no luggage. *Sokolow,* 109 S.Ct. at 1582. Clearly the kinds of suspicious activities observed by the police in *Sokolow* were far different from the "facts" in the present case.

Less "suspicion" was needed in *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). There, two officers in plain clothes observed three men who behaved in an "unusual manner" when they left the ticket counter in the airport. The officers followed the men and, when one of the men spotted the officers, he said to the other two, "let's get out of here." *Rodriguez,* 469 U.S. at 3, 105 S.Ct. at 309. Rodriguez then tried to flee, but was unsuccessful. When caught, he uttered a vulgar exclamation at one of the officers. *Rodriguez,* 469 U.S. at 4, 105 S.Ct. at 309. The Court held that the facts justified the *Terry* stop.

In *Royer,* the police believed that the suspect's "appearance, mannerisms, luggage, and actions fit the so-called 'drug courier profile.'" *Royer,* 460 U.S. at 493, 103 S.Ct. at 1321. The officers asked Royer if he had a minute to talk with them and he agreed. "Upon request, but without oral consent, he produced ... his airline ticket and driver's

license." *Royer,* 460 U.S. at 494, 103 S.Ct. at 1322. The names on the airline ticket and luggage did not match the name on his driver's license. The police asked about the discrepancy and Royer explained that a friend had made the airline reservation for him. Royer became more nervous during this conversation and the officers informed him that they were narcotics agents and suspected him of transporting narcotics.

The officers kept Royer's ticket and driver's license and asked him to join them and go to a nearby room. He did not respond, but went with them. Without Royer's permission, the officers retrieved and opened his luggage and discovered the contraband. *Royer,* 460 U.S. at 494, 103 S.Ct. at 1322. The Supreme Court stated: "What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327. The *Royer* plurality opinion concluded that the "consent was tainted because the detention in the office was an arrest for which probable cause was lacking."[5] 3 LaFave, *Search and Seizure,* § 9.3(c) at 444 (1987) (footnote omitted).

The *Reid* Court held that more suspicious facts were required than simply meeting the drug courier profile. The observed facts which were listed as supporting a reasonable suspicion were: (1) he flew in from a principal source city; (2) he arrived early in the morning which is the time when law enforcement is leanest; (3) his only luggage was a shoulder bag; and (4) he concealed the fact that he was travelling with someone (the district court discounted this fact). The Court observed that three of the four factual observations that were made "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude

---

**5.** Four dissenters on the Supreme Court thought these facts set out reasonable suspicion which justified the *Terry* stop.

that as little foundation as there was in this case could justify a seizure." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. Thus, the Court held that as a matter of law the law enforcement agent could not have reasonably suspected Reid of criminal activity on the basis of the observations made.

The Fourth Circuit has recently held that travel to and from a source city and nervousness do not constitute reasonable suspicion. *United States v. Haye,* 825 F.2d 32 (4th Cir.1987). In *Haye,* the officers stopped the suspects, who had just arrived on a plane from Miami, based on their observations which were consistent with the drug courier profile. Two officers approached the two men and, as one officer held up his credentials and announced they were police, the two suspects ran. *Haye,* 825 F.2d at 33. The addition of flight from the police to these two facts does give rise to reasonable suspicion. *Haye,* 825 F.2d at 34.

## Maryland

The Court of Appeals recently opined that, where an officer had reason to believe that the offense of either underage consumption of alcoholic beverages or obtaining alcoholic beverages for juveniles was being committed, a frisk was not justified. *Simpler v. State,* 318 Md. 311, 321, 568 A.2d 22 (1990). In *Simpler,* 318 Md. at 322, 568 A.2d 22, the police officer testified that patdowns "were a routine matter of caution," suggesting that any lawful stop justifies a frisk. This is not the case.

> "Judge Moylan ... succinctly pointed out that '[a]lthough a reasonable "stop" is a necessary predecessor to a reasonable "frisk," a reasonable "frisk" does not inevitably follow in the wake of every reasonable "stop." ' "

*Simpler,* 318 Md. at 319, 568 A.2d 22, quoting *Gibbs v. State,* 18 Md.App. 230, 238–39, 306 A.2d 587, (footnote omitted), *cert. denied,* 269 Md. 759 (1973). Similarly, the fact that the initial stop for speeding in the instant case was

valid, does not necessarily legitimize what occurred afterwards.

In *Mosley v. State,* 45 Md.App. 88, 92–93, 411 A.2d 1081 (1980), *aff'd,* 289 Md. 571, 425 A.2d 1039 (1981), this Court observed:

"Six variables have been suggested as means of determining whether a reasonable suspicion exists. These include:

1. The appearance of the detainee
2. Conduct
3. Criminal record
4. Environment
5. Police purpose
6. Source of information[.]" (Footnote omitted.)

*See also Watkins v. State,* 288 Md. 597, 603, 420 A.2d 270 (1980). We then applied these criteria, except one and three which did not apply, to the facts of that case. There, the police officer had observed the suspects for approximately 15 minutes before stopping them. The location of the stop also supported the officer's suspicion as he knew about many crimes that had been committed in the area within the preceding few weeks. The purpose of the stop was to prevent a crime of violence. As we noted, when balanced against the Fourth Amendment right to be free from unwarranted searches and seizures, "the articulable facts necessary to satisfy the *Terry* test should decrease as the severity of the investigated crime increases." *Mosley,* 45 Md.App. at 93, 411 A.2d 1081. Finally, in that case, we noted that the source of the information was the law enforcement agent himself, and therefore this information was highly reliable. Based on these four criteria, we affirmed the trial court's finding of reasonable, articulable suspicion.

A more recent decision of this Court which applied the reasonable suspicion test is *Timms v. State,* 83 Md.App. 12, 573 A.2d 397 (1990). In *Timms,* Judge Robert Bell distinguished the case *sub judice* from *Lemmon.* The police in *Timms* observed Timms talking to another person in the

early morning hours in an alley in a neighborhood where "B & E [breaking and entering] calls were a frequent occurrence." *Timms,* 83 Md.App. at 23, 573 A.2d 397. We held that these facts supported a reasonable suspicion and were unlike the situation in *Lemmon* where the police had no more than an anonymous tip heard by three police officers who were on patrol.

An even more recent case decided by this Court with similar legal issues is *Derricott v. State,* 84 Md.App. 192, 578 A.2d 791 (1990), filed *September 4,* 1990. In *Derricott,* a police officer stopped a car for speeding. During the course of the stop, the officer observed the following: (1) the driver was a young, black male, (2) driving an expensive sports car, (3) wearing a blue sweat suit, gold chains, and a thick, monogrammed gold ring. *Derricott,* at 200, 578 A.2d at 795. In addition, from his position outside the car, the officer looked inside the car and saw a beeper lying on the center console, as well as various papers containing phone numbers lying on the passenger seat. This Court upheld the finding of reasonable, articulable suspicion for the search based on these facts. We said that, although some of the factors by themselves were innocuous, when looked at together, these "facts" had "special significance." But, as Judge Moylan also pointed out:

"In the last analysis, it is never a profile *per se* that is the object of appellate review. The data to be scrutinized by the suppression hearing judge and appellate judge alike are the factual observations of the policeman. They may, to be sure, be interpreted through the collective police experience reflected in a profile. The ultimate issue, however, is whether the factual observations in combination, refracted through the trained eye of the policeman, yield articulable suspicion."

*Derricott,* at 205, 578 A.2d at 797.

### Instant Case

We must look at the situation known to Paros when he gave the warning ticket for speeding to Snow to determine

whether he had a reasonable suspicion that a crime was being or was about to be committed.

Paros undeniably had good cause to stop Snow, who was driving in excess of the legal speed limit. When questioned by Snow's attorney about the events of that day, Officer Paros testified as follows:

"BY [SNOW'S ATTORNEY]:

\*    \*    \*    \*    \*    \*

"Q   Was there a reason you asked Davis to step from the vehicle?

"A   If I'm going to conduct a consent search or a K–9 scan and I have someone with me, I ask them to exit the vehicle to remove them from any weapons that might be available.

"Q   You had already made up your mind before this consent search you were going to search this vehicle.

"A   I made up my mind, if it came down to that, that would be out of the way. They would be removed from the threat of weapons.

"Q   That's not my question. Before, before Mr. Snow was presented with this consent to search, you already made up your mind you were going to search that vehicle?

"A   *No, I had no probable cause to search that vehicle at that time.* You're asking me if I made up my mind and the answer is no.

"Q   Okay. And then after Mr. Snow refused to sign, what did, how did you consider that or put that into the equation?

"A   That it's time to use the K–9.

"Q   Because he's refused to sign?

"A   Yes, sir.

"Q   In other words—

"A   Based with other things that I had seen.

"Q   —if somebody exercises his Constitutional right not to sign, to you that's an idea that this person has guilty knowledge, right?

"A   It has been known to happen.   Most people sign the consents, that's what's amazing.

"Q   This is supposed to be a voluntary consent, right?

"A   Yes, sir.

"Q   And your experience though is most people sign it?

"A   Yes, sir.

"Q   Okay.   So, Mr. Snow refuses to sign and then you decide to do a scan, correct?

"A   Yes, sir.

"Q   Did you tell them they were free to leave?

"A   No, I did not.

"Q   Matter of fact, you told them they had to stay over in the grass, didn't you?

"A   Stand off to the side, yes, sir.

"Q   You specifically told them to stay in a certain area. Matter of fact, one of them, you told them they were being detained, right?

"A   No, I don't recall telling them they were being detained.

"Q   'Course, they couldn't go anywhere, could they?

"A   No, I was going to conduct a scan."   (Emphasis added.)

■   In addition, at the suppression hearing, Snow testified as follows:

"BY [DEFENSE COUNSEL]:

"Q   Okay.   Now, back on April the 4th, 1989, you were stopped by Trooper Paros.   Is that correct?

"A   Yes.

"Q   In Cecil County?

"A   Yes.

"Q   And can you tell us what happened when he stopped you?

"A   He came up to the truck.

    *    *    *    *    *    *

"Q   ... What happened then?

"A He told me I was speeding. He asked me for my license, registration.

"Q Were you still in the vehicle?

"A Yes.

"Q Okay. What did you do then?

"A I gave it to him and he went back and checked, checked that out and he came back, told me to get out and walked me to the back of the truck.

"Q He told you to get out?

"A Yes.

"Q Okay. When he came back, did he give you a warning ticket?

"A He gave me, he told me about the ticket in the back of the truck.

"Q So, he walked you to the back of your truck?

"A Yes.

"Q Where was Mr. Davis at this time?

"A Still in the truck.

"Q When you got to the back of the truck what happened?

"A Well, he told me about the ticket. He wasn't going to give me no speeding ticket, he was going to give me a warning ticket and he asked me where I was going. He asked me where I was coming from. I told him Philly and going to Northeast D.C. and he asked me about the drugs in D.C. I told him I didn't know nothing about it. And then he asked me could he search the vehicle and I told him no and he said, well, I can do it—he showed me this piece of paper and then he said, 'Well, I can do it one way or the other. Your way or my way.' Then he asked me could he search the vehicle and I said no.

"Q What did he do then?

"A He told my brother to get out of the car.

"Q You say your brother, you're talking about Davis here?

"A   Yeah.   By this time the other police came up and he told my brother to get out of the car and they got the dog out.

"Q   What did he tell you and your brother to do?

"A   Get in the grass.

"Q   Told you to get there.   Did you ask him at that time if you were being detained or arrested or anything?

"A   Yes.

"Q   Who asked him?

"A   Well, he asked him first and I asked him, you know, right, you know, right like after.

"Q   Mr. Davis asked first?

"A   Yeah.

"Q   What did Mr. Davis say?

"[STATE'S ATTORNEY]:   Objection.

"THE COURT:   Overruled.

"A   He said were we under arrest?

"Q   What did Trooper Paros say to you?

"A   He said we were being detained.

"Q   Being detained.   Couldn't leave, right?

"A   Right.

"Q   And how, what did you feel you were under?

"A   I felt we was under arrest."

Whether or not Paros told Snow that he was being detained is irrelevant.   Paros's and Snow's testimony were consistent.   Applying the principles of *Lemmon* to the instant case, we hold that Snow was seized when he was told by Paros to remain at the side of the road while the dog sniffed his vehicle.   Between the time the warning ticket was given and the formal arrest made, Snow could reasonably conclude that he was seized for purposes of the Fourth Amendment.   It is also clear that the Blazer was "seized" to conduct the dog sniff.   The question we must now ask is whether such seizure was reasonable.

## Reasonableness

██ As we have already stated, the basis for Paros's suspicion that Snow was carrying drugs was fourfold: (1) Snow seemed nervous and avoided making eye contact; (2) Snow was traveling from Philadelphia to Washington, D.C.; (3) three air fresheners hung from the rear-view mirror of Snow's Blazer; and (4) Snow did not consent to the requested search of the vehicle. In particular, Paros indicated that the fact that Snow failed to consent to the required search cinched his decision to conduct the search. This refusal cannot be used against Snow. Moreover, we agree with Snow that, collectively, the remaining "facts" do not meet the "reasonable and articulable suspicion" standard.

## Nervousness

According to Paros, the first fact he observed which made him suspect Snow was carrying illegal drugs was that Snow did not make eye contact with him. Most citizens are nervous when they receive a citation from a law enforcement agent. Further, nervousness is a highly subjective observation. *See* Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas,* 65 B.U.L.Rev. 843, 903 (1985). Not making eye contact with police officers probably occurs more often than does the situation where the citizen makes eye contact with the police officer. Nervousness did not justify detaining Snow after the original stop for speeding was over.

## The Route

The fact that Paros had some knowledge of reports which stated that the Philadelphia—Washington, D.C., route was being used to transport drugs adds little or nothing to his level of suspicion. That stretch of road is traveled by thousands of vehicles every day. The fact that Snow happened to be on this well-traveled highway does not distinguish him from any of the other drivers of vehicles that were on that road. Further, given the omnipresence of

controlled dangerous substances in current society, we would be hard-pressed to say that every major city in the United States is *not* either a "source city" or a "user city," or both. Snow's use of this path did not reveal any distinguishing footprints.

### Air Fresheners

The third observation upon which Paros contends he had a reasonable, articulable suspicion was the presence of three air fresheners hanging from the rear-view mirror. Air fresheners are, as far as we know, a completely legitimate object; some are, undoubtedly, thought to be ornamental as well as functional. Nor is the fact that Snow had three air fresheners, as opposed to one, suspicious. The addition of a new freshener without removing the old one is not unusual. As with other cleaning products, when the consumer is uncertain regarding the useful life of a product, the tendency is to keep the old one for a while longer.

### Refusal to Consent to Search

■  Lastly, Paros testified that, because Snow refused to sign the form consenting to the search of his car and "other things that I had seen," Paros decided "it was time to use the K–9" and conduct a scan.[6] That law enforcement personnel assume that a citizen exercising his or her consti-

---

**6.** The United States Supreme Court has said that "exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). The Tenth and Eleventh Circuits have held, however, that using a dog to sniff search an automobile is not a search where the car was stopped upon a reasonable suspicion that it contained drugs. *United States v. Stone,* 866 F.2d 359 (10th Cir.1989); *United States v. Hardy,* 855 F.2d 753, 758–59 (11th Cir.1988). Thus, under *Place,* Officer Paros' use of the K–9 dog would appear not to be a search for purposes of the Fourth Amendment. These more recent federal appellate decisions, however, leave open the question whether the initial purpose of the stop must be to search for drugs, or whether that purpose can change during the course of the stop. Nonetheless, for purposes of our discussion we shall assume that the dog sniff was not in and of itself a search; we do so because we hold that Officer Paros' detention of Snow and his vehicle was a seizure.

tutional right to reject a search indicates that he or she is guilty of some criminal activity is disturbing. A citizen's exercise of the Fourth Amendment right to be free from unwarranted searches does not trigger a reasonable suspicion that he or she is carrying narcotics.

An analogous situation occurs where innocent and guilty persons alike may assert their right to remain silent when arrested or during custodial interrogation; guilt cannot be inferred from that silence. *United States v. Hale,* 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975). Moreover, the United States Supreme Court held that California's comment rule, which permitted a judge to instruct a jury that a criminal defendant who fails to testify or testified without denying or explaining evidence within his knowledge, tends to indicate, the truth of such evidence, violates the Fifth Amendment. *Griffin v. California,* 380 U.S. 609, 613–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). *See also Attorney Grievance Comm'n of Maryland v. Unnamed Attorney,* 298 Md. 36, 467 A.2d 517 (1983) (Constitution of Maryland, Declaration of Rights, Art. 22). In addition, at least one Court has held that a judge's failure to instruct the jury that the defendant's refusal to consent to a warrantless search could not be used as evidence of guilt was reversible error. *United States v. Prescott,* 581 F.2d 1343, 1350–53 (9th Cir.1978). The same rationale applies to a defendant's desire to avail himself or herself of the Fourth Amendment right to be free from warrantless searches. *Accord, People v. Redmond,* 29 Cal.3d 904, 176 Cal.Rptr. 780, 633 P.2d 976, 985 (1981) (Bird, C.J., dissenting).

Further, we agree with Snow that the facts of this case demonstrate the ease with which any circumstance could be construed as "suspicious." For example, had Snow *not* appeared nervous and made direct eye contact with Officer Paros that could have indicated familiarity in dealing with police. Or, had Snow been driving on a "back road" instead of the most direct route, his actions could appear to be directed at avoiding law enforcement agents. The so-called

"facts" observed in this case are not distinct from those in *Reid* which describe a large segment of the population. Thus, Office Paros lacked a reasonable suspicion which is required by *Terry*.

### *Mosley* Criteria

Applying the *Mosley* criteria listed above to the case at bar, also leads us to conclude that Paros did not have a reasonable suspicion that Snow was committing or was about to commit a crime other than the speeding violation for which he was stopped. As in *Mosley*, the suspect's appearance and criminal record do not apply. But Snow's conduct was not, as it was in *Mosley*, inherently suspicious. He was not "casing" a store; he merely failed to make eye contact with the officer. The fourth *Mosley* criteria, the environment or place of the stop was not, in and of itself, suspicious. Traveling on a major highway at noontime is not disreputable in any way, especially given the fact that I–95 is the quickest route from Philadelphia to Washington, D.C.

The purpose of the stop, the fifth criteria mentioned in *Mosley*, was to enforce the highway speed limits, whereas the purpose of the "dog sniff" was to detect drugs. These two purposes are not related to one another. Although possessing drugs or intending to distribute drugs is clearly a crime which may be associated with violence, it is not inherently violent like robbery which was at issue in *Mosley*. Thus, the type of intrusion which occurred here did not involve a "severe" crime which required only minimal articulable suspicion; the search here required more justification than did the stop in *Mosley*.

Finally, Paros was the first-hand source of the observed information which does lead to the conclusion that the observation was reliable. These four *Mosley* criteria lead to the conclusion that Paros did not have a reasonable, articulable suspicion that Snow's vehicle contained illegal drugs.

## TIMMS AND DERRICOTT

We also hold that these facts easily distinguish this case from our recent decisions of *Timms* and *Derricott*, which held that there was a reasonable, articulable suspicion under those circumstances. In *Timms*, the defendant was talking to another individual during the wee hours of the morning in an alley in a neighborhood where thefts were a common occurrence. The unusual time and place were clearly suspicious. The observed facts in *Derricott* also supported a finding of reasonable, articulable suspicion. The number of "facts" observed by the officer in that case greatly exceeded the number of facts here. The driver was a·young, black male who wore "a blue sweatsuit, gold chains, and a thick, monogrammed gold ring." *Derricott*, at 200, 578 A.2d at 795. Even more significantly, Judge Moylan pointed out that the beeper, which was visible inside the car, is a classic instrumentality of a drug dealer. In the instant case, however, Paros made no mention of anything remarkable about Snow's attire or the presence of any of the more frequent paraphernalia of a drug dealer, such as a beeper. When looking at the totality of the circumstances, we see a clear distinction between *Timms* and *Derricott*, which upheld a finding of reasonable, articulable suspicion and the instant case, where we hold that there was no reasonable, articulable suspicion.

### Duration of Detention

■ The State, however, also justifies the detention of Snow's vehicle on the basis that the total time that elapsed between the stop and the completion of the scan did not exceed the normal time for processing papers during a traffic stop. The judge who heard the motion to suppress used this same rationale to support his denial of the motion.

The intrusion permitted "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Here, the purpose of the stop was to warn or issue a ticket to Snow for speeding. That

purpose was fully fulfilled, but the detention was continued. The Supreme Court has also said that the "brevity of invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Although it is true that the duration of a stop is a factor in calculating whether an intrusion is within constitutional limitations, *see Royer,* 460 U.S. at 500, 103 S.Ct. at 1325, the State must first demonstrate a reasonable, articulable suspicion that a crime is being or is about to be committed. The State, as we have stated above, did not adequately demonstrate a reasonable, articulable suspicion. Additionally, "stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984).

### Speeding and the Subsequent Search

The State also claims that the valid initial stop for speeding justifies the subsequent detention of the Blazer for the scan, which included the detention of Snow. The cases the State cites for this proposition are inapposite.

*Commonwealth v. Lehman,* 265 Pa.Super. 480, 402 A.2d 539 (1979), does, as the State asserts, stand for the proposition that an officer who observed eccentric driving had "ample justification" to stop the driver. *Lehman,* 402 A.2d at 540. The officer then approached the vehicle, and administered a field sobriety test which the suspect passed. The officer then approached the passenger side of the vehicle, shined a flashlight into the truck and saw marijuana in "plain view." *Lehman,* 402 A.2d at 540. This factual scenario is not the equivalent of the detention which occurred here. Erratic driving is suspicious and well known to be associated with drunk driving or driving under the influence of drugs.

In addition, the State's reliance on *Jones v. Commonwealth*, 230 Va. 14, 334 S.E.2d 536 (1985), is misplaced. In *Jones*, the police officer had been alerted to be on the lookout for "a black male in his 20's, 5'10", 175 [pounds], with a husky build, dark complexion, and in one incident [was] wearing shorts and a T-shirt [and in] another ... was ... wearing a jogging suit [and] carrying a large knapsack like bag, possibly a duffel bag." *Jones*, 334 S.E.2d at 538. This man was wanted in connection with burglaries in the area. Jones not only matched the physical description given, but he was also wearing a jogging suit and carrying two duffel bags when the officer stopped him. Plus, the officer had observed the suspect behaving in a suspicious manner: the suspect came out of a hotel garage, went into a nearby convenience store, emerged less than 20 seconds later and returned to the hotel garage. *Jones*, 334 S.E.2d at 538. As a result, the police officer had a reasonable, articulable suspicion that the suspect was the individual about whom he had been warned.

The State claims that *Jones* held that a police officer may properly continue to question a suspect regarding his identity after conducting a frisk and a preliminary search which yielded no weapons. So it does. But the State fails to add that, when the officer asked the suspect for identification, the suspect produced a commercially manufactured I.D. card which appeared to have been altered. The suspect told the officer he had no middle name, but the card displayed the name "Tony N. Brown." There were other oddities with the card and the officer arrested the suspect for failing to provide identification as required by the local county code. Then, as a search incident to arrest, the officer went through the arrestee's bags, hoping to find positive proof of identification. During this search, the officer found "several packs of white powder," the substance of which was later shown to be heroin. *Jones*, 334 S.E.2d at 538. If anything, this case disserves the State. The level of suspicion greatly exceeded that present here, and justified the detention of

Jones. Moreover, the contraband was found in a search that was clearly legal as a search incident to arrest.

Nor does *State v. Hewey*, 144 Vt. 10, 471 A.2d 236 (1983), help the State's cause. In *Hewey*, the officer originally stopped the defendant's car for a suspected registration violation. He asked the driver for his registration and license. The defendant could not produce his registration and explained the reason why the registration plate and inspection sticker were not from the same state. The officer then told defendant that he would have to run a check of his driver's license. *Hewey*, 471 A.2d at 237. Defendant's license was found to be under suspension.

This factual scenario is entirely different from the instant case. As the *Hewey* Court stated, "[I]t was not unreasonable for the officer to detain defendant long enough to check and see if he had a valid license to operate the car." *Hewey*, 471 A.2d at 239. Similarly, if that had occurred here, we would hold it "reasonable" under the circumstances. But in the instant case, the officer did not perform a related "administrative procedure." Rather, the officer seized Snow's vehicle for a suspected offense which was unrelated to the initial reason for which Snow was stopped. The first stage of the incident, the speeding, was complete when Paros moved to the second act of detaining Snow for the scan of his vehicle. Thus, the tenet that, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible[,]" *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878, quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967) (Fortas, J. concurring), applies here.

## CONCLUSION

■ The case at bar demonstrates a police officer's "hunch" that there were illegal drugs in Snow's vehicle. It so happens that the "hunch" was correct, but this does not justify the seizure of Snow and his passenger, which was an additional intrusion on Snow's Fourth Amendment rights.

The comments of the judge who heard the motion to suppress indicate some of the dangers of approving the officer's actions. The motions judge concluded that hearing with the following exchange:

"THE COURT: Well, I've already said that the detention was very limited in this case. It was bang, bang, within moments from the time the officer told him to go into the grass until the officer alerted, until the dog alerted. The officer certainly had a right to detain him up to that point.

\*    \*    \*    \*    \*    \*

"[SNOW'S ATTORNEY]: Judge, just for the record, this is the weakest, weakest probable cause I think I've ever seen. Just like the one we had before where Paros said, 'Yes, any person in Cecil County went and said he had to go to the bathroom with a station 3 miles behind and had tinted windows, that's enough for me to lock him up.' And that's what the citizens of Cecil County face, Judge.

"THE COURT: They carry drugs, they've got to.

"[SNOW'S ATTORNEY]: I'm talking about those that don't carry drugs.

"THE COURT: The ones that don't carry drugs, they shouldn't be subjected to anything. All right."

We think these words and the potential for abuse speak for themselves.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. CECIL COUNTY TO PAY COSTS.