795 A.2d 790

Dominique CARTER

v.

STATE of Maryland.

No. 0891, Sept. Term, 2001.

Court of Special Appeals of Maryland.

April 3, 2002.

**672**

David M. Goldstein, Ellicott City, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Marna McLendon, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before KENNEY, KRAUSER, CHARLES E. MOYLAN, Jr. (Retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, Retired, Specially Assigned.

This case involves the Fourth Amendment law of "stop and frisk" pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). More precisely, it involves only the "stop" aspect of "stop and frisk" law. There was no frisk and the law governing frisks is not implicated in any way. See *Gibbs v. State,* 18 Md.App. 230, 239, 306 A.2d 587, *cert. denied,* 269 Md. 759 (1973), for the differences in the respective purposes of the two police procedures and their respective justifications.

The appellant, Dominique Carter, was convicted in the Circuit Court for Howard County by Judge James B. Dudley, sitting without a jury, of possession of marijuana with intent to distribute within 1000 feet of an elementary school and related charges. On this appeal, he raises the single contention that at a pretrial suppression hearing, Judge Raymond J. Kane, Jr., erroneously failed to suppress physical evidence on Fourth Amendment grounds. We shall confine our review, therefore, to that evidence brought out at the suppression hearing. *Cartnail v. State,* 359 Md. 272, 282–83, 753 A.2d 519 (2000).

At approximately 7:47 p.m. on December 17, 2000, the van in which the appellant was sitting and all of its occupants were subjected to a *Terry*-stop. At 8:25 p.m., a K–9 officer and a

trained drug-sniffing dog arrived at the scene. The dog scanned the vehicle and "alerted" to the presence of drugs.

■ From that point on, there is no question about the Fourth Amendment proprieties. The dog "alert" supplied the probable cause for a warrantless search of the van. As we stated in *State v. Funkhouser*, 140 Md.App. 696, 711, 782 A.2d 387 (2001):

When a qualified dog signals to its handler that narcotics are in a vehicle, moreover, that is *ipso facto* probable cause to justify a warrantless *Carroll* Doctrine search of the vehicle.

See also *Wilkes v. State*, 364 Md. 554, 586–87, 774 A.2d 420 (2001); *Gadson v. State*, 341 Md. 1, 8, 668 A.2d 22 (1995); *Timmons v. State*, 114 Md.App. 410, 417, 690 A.2d 530 (1997); *In Re Montrail M.*, 87 Md.App. 420, 437, 589 A.2d 1318 (1991); *Snow v. State*, 84 Md.App. 243, 248, 578 A.2d 816 (1990).

■ The marijuana found on the floorboard behind the passenger's seat, where the appellant had been sitting, supplied the probable cause for the warrantless arrest of the appellant. *Folk v. State*, 11 Md.App. 508, 511–12, 275 A.2d 184 (1971). The appellant, indeed, admitted that the marijuana was his.

Our concern is only with the time period from 7:47 p.m. to 8:25 p.m. Our concern in that regard is twofold. Our first inquiry will be whether articulable suspicion existed for the initiation of the *Terry*-stop. Our second concern will be whether a detention of 35–40 minutes exceeded in its duration the permissible scope of a *Terry*-stop.

## A False Trail:

### The Irrelevance of Arrest Law

In terms of the initial justification for the police intrusion, the appellant attempts to transmute a *Terry*-stop into an arrest and thereby to raise significantly the bar of reasonableness that the State must clear from the level of articulable or reasonable suspicion up to the level of probable cause. In-

volved in this case, however, is a *Terry*-stop, pure and simple. There is, to be sure, a Fourth Amendment hurdle to be cleared, but a less intimidating one than that proposed by the appellant.

For his alchemy of turning base metal into gold, of turning a *Terry*-stop into an arrest, the appellant relies on for his philosopher's stone the case of *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The only transmutation he achieves, however, is that of representing *Mendenhall* as something it never was. The appellant asserts that in *Mendenhall* "the Court distinguished arrest from a mere traffic or *Terry* stop."

The Supreme Court did no such thing. *Mendenhall* did not concern the law of arrest. What it distinguished was a *Terry*-stop, which requires Fourth Amendment justification, from a mere accosting, which does not. The Supreme Court explained, 446 U.S. at 553–54, 100 S.Ct. 1870:

> We adhere to the view that *a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.* The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116. *As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized objective justification.*

(Emphasis supplied).

The conclusion in *Mendenhall* was that a *Terry*-stop had not occurred and that the Fourth Amendment was not, therefore, involved so as even to require satisfaction.

On the facts of this case, no "seizure" of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. *Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest.* The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official.

446 U.S. at 555, 100 S.Ct. 1870 (emphasis supplied).

What the appellant attempts to do is to equate 1) a Fourth Amendment "seizure of the person" and 2) the denial by the police of the citizen's "freedom to leave" with the status of being arrested. *Mendenhall*, however, describes those conditions as the classic indicia of a *Terry*-stop. An arrest involves more. Citing *Terry v. Ohio* as its authority, *Mendenhall* explained the circumstances that turn a mere accosting into a *Terry*-stop.

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See Terry v. Ohio.*

446 U.S. at 554, 100 S.Ct. 1870 (emphasis supplied). Sylvia Mendenhall was stopped, but she was not arrested.

*United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), was also a "stop and frisk" case and nothing more, notwithstanding the fact that the stopping officer

> approached Hensley's car with his service revolver drawn and pointed into the air. He had Hensley and a passenger seated next to him step out of the car.

469 U.S. at 224, 105 S.Ct. 675. And see *United States v. Oates,* 560 F.2d 45, 57 (2d Cir.1977) ("While it is clear that Oates and Daniels were not at that point free to do as they pleased, it can no longer be questioned that, although every arrest is a form of detention, the converse is not true.").

■ The appellant solemnly insists that he "was not free to leave." Of course, he wasn't. That's why this was a *Terry*-stop requiring the *Terry* level of Fourth Amendment justification. Had he been free to leave, this would have been a mere accosting and the Fourth Amendment would not even have been implicated. Under *Terry,* a stopee's freedom of movement is most definitely restricted under the command of the law. If he attempts to leave after being ordered, perhaps at gunpoint, to stop, he may be shot or otherwise forcibly restrained. Such consequences, notwithstanding the appellant's urging to the contrary, do not *ipso facto* transform a *Terry*-stop into an arrest.

■ Although the appellant would understandably like to set the bar of police justification at the higher probable cause level, we hold that it rests only at the articulable or reasonable suspicion level. Indeed, the entire rationale for "stop and frisk" law is that these lesser seizures of the person, not amounting to a full-scale arrest, are permitted on a predicate less substantial than probable cause. That is why they are severely limited in scope. The lesser justification only permits a lesser intrusion. *Alfred v. State,* 61 Md.App. 647, 659, 487 A.2d 1228 (1985). As Chief Judge Murphy pointed out for this Court in *Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338, *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998):

> It is well settled ... that the forcible stop of a motorist may be based on reasonable articulable suspicion that is insufficient to establish probable cause.

### Articulable Suspicion

### For the Terry Stop

■ Having settled the level of justification required, we hold that articulable or reasonable suspicion did exist in this case for the initial *Terry*-stop of the van and its occupants.

## A. An Anonymous Phone Call and Its Nature

At about 7:40 p.m. the Howard County Police Department received a telephone call. The caller, to be sure, was anonymous. The circumstances were such, however, as to give rise to a reasonable inference that the caller was a concerned neighbor and, therefore, a "citizen informer" rather than the more suspect confidential informant "from the criminal milieu." For the distinction, see *Dawson v. State*, 14 Md.App. 18, 33–34, 284 A.2d 861 (1971); *Hignut v. State*, 17 Md.App. 399, 410 n. 2, 303 A.2d 173 (1973).

Throughout the 1960's and 1970's, an extensive body of law developed as to how courts should assess information received by the police from informants (including telephone callers). The earlier cases involved instances in which the informant was the classic police "snitch" or "stool pigeon," someone "from the criminal milieu," exchanging underworld information for cash payment or for other under-the-table police favors. The assessment of information from such sources was accordingly circumscribed with scepticism. The suspect's credibility needed bolstering in order to be given any weight.

As the analysis of information from third-party sources evolved, however, it soon came to be recognized that there was also a broad category of third-party sources, such as concerned citizens or fellow law enforcement officers, whose veracity was not inherently suspect and as to whom the skepticism directed at police stool pigeons was not appropriate. In *Dawson v. State*, 14 Md.App. at 34, 284 A.2d 861, this

Court quoted with approval the Supreme Court of Colorado in *People v. Glaubman,* 175 Colo. 41, 485 P.2d 711, 717 (1971):

"More often than not, the informant is paid or provides information in exchange for immunity from prosecution of his own misdeeds.

"Our view, which is supported by a number of decisions, is that the citizen-informer, adviser, or reporter who acts openly to see that our laws are enforced should be encouraged, and his information should not be subjected to the same tests as are applied to the information of an ordinary informer."

See also *Edmondson v. United States,* 402 F.2d 809 (10th Cir.1968); *Coyne v. Watson,* 282 F.Supp. 235 (D.C.Ohio 1967); *People v. Hester,* 39 Ill.2d 489, 237 N.E.2d 466 (1968); *People v. Lewis,* 240 Cal.App.2d 546, 49 Cal.Rptr. 579 (1966); *State v. Paszek,* 50 Wis.2d 619, 184 N.W.2d 836 (1971); *People v. Hoffman,* 45 Ill.2d 221, 258 N.E.2d 326 (1970); *People v. Carter,* 116 Ill.App.2d 62, 253 N.E.2d 490 (1969); *State v. Mazzadra,* 28 Conn.Supp. 252, 258 A.2d 310 (1969); *People v. Griffin,* 250 Cal.App.2d 545, 58 Cal.Rptr. 707 (1967); *Walker v. State,* 196 So.2d 8 (Fla.App. 3 Dist.1967); and *People v. MacDonald,* 173 Colo. 470, 480 P.2d 555 (1971).

In this case, abundant independent police verification renders the distinction between 1) citizen-informers and 2) informants from the criminal milieu less critical than might sometimes be the case. It nonetheless pays to remember that every anonymous telephone call need not necessarily be viewed with the scepticism appropriate for a police "stool pigeon."

## B. The Content of the Call and Its Significant Verification

The telephone call reported that, on a Sunday evening when school was not in session, a suspicious vehicle was parked on the parking lot of the Deep Run Elementary School. The call further recounted that individuals may be selling drugs and

that there were juveniles "approaching the van and leaving the van."

■ An anonymous call that might not be reliable enough to establish probable cause might nonetheless be reliable enough to establish reasonable suspicion. The predicate information may not only be of a lesser quantity; it may also be of a lesser quality. In *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), as here, the initial suspicion was triggered by an anonymous telephone call. In that case, as here, there was then independent police verification of some of the contents of the call. In *Alabama v. White*, the Supreme Court held that there was articulable suspicion for a *Terry*-stop. It contrasted the required predicate for a *Terry*-stop with the required predicate for probable cause.

> *Reasonable suspicion is a less demanding standard than probable cause* not only in the sense that *reasonable suspicion can be established with information that is different in quantity* or content *than that required to establish probable cause,* but also in the sense that *reasonable suspicion can arise from information that is less reliable than that required to show probable cause.*

496 U.S. at 330, 110 S.Ct. 2412 (emphasis supplied).

In this case, as in *Alabama v. White*, there was significant independent police verification of the content of the call. When the police arrived at the school six minutes after the call, the van was the only vehicle on the school parking lot. Two persons were seen walking away from the van. The time and place were enough to set the antennae of a "savvy" investigator aquiver. What was the van doing at the school on a Sunday evening? Why were groups of persons generally or juveniles specifically "approaching the van and leaving the van?" A decent respect for constitutional liberties did not require the police to assume that the occupants of the van were dispensing candy bars. What immediately ensued as the police approached, moreover, added additional suspicion.

## C. Flight or Other Apparent Avoidance of the Police

As the police arrived on the scene, two persons were walking away from the van. As those two persons observed the approach of the police, they stopped walking and began running. At the approach of the police, the van itself also started to pull out of the parking lot, but was immediately stopped.

With respect to both the attempted departure of the van and the sudden accelerated departure of the two pedestrians upon the approach of the police, the observation of the Supreme Court in *Illinois v. Wardlow,* 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), is apt, just as it was deemed pertinent there in helping to justify a *Terry*-stop.

> Our cases have also recognized that nervous, *evasive behavior is a pertinent factor in determining reasonable suspicion.* Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.... We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.

(Emphasis supplied). Pertinent also is Justice Scalia's observation for the Court in *California v. Hodari D.,* 499 U.S. 621, 623–24 n. 1, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991):

> That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ("The wicked flee when no man pursueth.").

It is simply intuitive wisdom that, as a statistical generality, law breaking persons are more likely than law abiding persons to fear the police and to seek to avoid their presence. Conversely, law abiding persons are more likely than law breaking persons to welcome the police and to be reassured by their presence. Apparent reaction to the police is a factor at least worthy of consideration. There clearly was in this case rea-

sonable suspicion, under *Terry*, to stop the van and to make further inquiry.

## D. Suspicion Continues to Mount: Strange and Inconsistent Responses

In the first minutes of the stop, moreover, articulable suspicion of drug activity continued to mount. The driver, for starters, could not produce an operator's license. The driver was then asked what the van was doing on the school parking lot at that hour. He stated that he and the others were on the parking lot for the purpose of "picking someone up." He was unable to state, however, who that person to be picked up was or how they would know him. The front seat passenger was independently asked by another officer why the van and its occupants were on the school parking lot. By contrast with the driver's explanation, he explained that they were there for the purpose of just "hanging out."

 For purposes of analysis, a *Terry*-stop is not frozen in time at the split second of its inception. It is a continuing investigative activity, and as it unfolds, reasonable suspicion may mount. As suspicion mounts, moreover, it may justify a longer detention than would initially have been justified. The escalating suspicion in this case is remarkably akin to the escalating suspicion in *United States v. Hardy*, 855 F.2d 753 (11th Cir.1988).

In that case, an automobile occupied by two persons was stopped on a rural Georgia highway for exceeding the speed limit by twelve miles per hour. "At approximately 9:25 p.m., [Trooper] Ralston gave [the driver] a warning for the speeding offense, ending the investigation of the traffic violation." 855 F.2d at 757. Without more, the detention should have then terminated. In the course of the processing of the initial stop, however, several circumstances caused the suspicion to escalate into a reasonable basis for an investigatory stop for a narcotics violation. That enhanced suspicion justified a further detention pending the arrival of a drug-sniffing canine. The dog arrived fifty minutes after it had been summoned and

one hour and twenty-eight minutes after the initiation of the original traffic stop.

The enhancement of suspicion that justified prolonging the detention in that case closely resembled the enhancement of suspicion in this case. After the initial traffic stop, the driver had been asked "to produce a driver's license and vehicle registration." 855 F.2d at 754. As in this case, the driver "was unable to provide a driver's license." He told the trooper that "he had lost his wallet and driver's license while on vacation in Florida." *Id.*

The primary mounting justification for detaining the suspects until a drug-sniffing canine could be brought to the scene, however, was the conflicting and inconsistent stories told by the two occupants of the vehicle as to where they had been. The driver told the trooper that he and the passenger "had spent a couple of weeks in Fort Myers, Florida, that they had been fishing, and that they had stayed with friends in Fort Myers." *Id.* The passenger, by contrast, told the trooper that he and the driver "had been to Fort Myers for four days and that they had stayed in a trailer owned by [the passenger]." *Id.* at 755.

In the holding of the Eleventh Circuit, the "gaps and inconsistencies" in the two stories contributed significantly to the reasonable suspicion for detaining the suspects pending the arrival of the drug-sniffing dog.

> [The trooper] knew that Huffman claimed that the two had taken a two-week vacation and had stayed with friends whereas Hardy said that they had been in Fort Myers for only four days and had stayed in Hardy's trailer.... For two friends who supposedly had taken a fishing trip to Florida together, Hardy and Huffman knew remarkably little about each other. *The gaps and inconsistencies observed by Ralston created a reasonable suspicion justifying the investigative stop.*

855 F.2d at 758 (emphasis supplied).

The fundamental purpose of a *Terry*-stop, based as it is on reasonable suspicion, is to confirm or to dispel that

suspicion by asking for an explanation of the suspicious behavior. A major factor in then determining whether to terminate or to prolong the *Terry*-stop, therefore, is necessarily the nature of the response or responses given to the police. In *State v. Watson,* 165 Conn. 577, 585, 345 A.2d 532, 537 (1973), the Supreme Court of Connecticut described the legal significance of the responses given to the police.

*The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind.* If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

(Emphasis supplied).

*People v. Rogers,* 71 Ill.App.3d 1046, 28 Ill.Dec. 375, 390 N.E.2d 542, 545 (1979), also reasoned that it

"would be illogical for a statute to authorize an officer to demand an explanation of an individual's actions yet require the officer to stop all questioning even when the response was clearly inadequate."

See also *State v. Noel,* 137 N.H. 384, 386, 628 A.2d 692, 693 (1993) (a 42 minute detention was held to be reasonable because the stories told by the defendant and his companion "were inconsistent," which inconsistency "heightened the officers' suspicions."); *State v. Moffatt,* 450 N.W.2d 116, 119 (Minn.1990) (a 60 minute stop on suspicion of burglary held to be reasonable because "the men were soaked with sweat and *gave a lame excuse for being in the area.*" (emphasis supplied)); *United States v. Richards,* 500 F.2d 1025, 1029 (9th Cir.1974) ("Appellant's implausible and evasive responses to these questions indicated that something was awry and created even more reason for the investigation being pursued further."); *State v. Davis,* 104 N.J. 490, 508, 517 A.2d 859, 869 (N.J.1986) ("As the questioning unfolded, Officer D'Andrea received answers that tended to strengthen his suspicions that the suspects were up to no good. For defendant and his

compatriot not only failed miserably to dispel the officer's suspicions, they effectively talked themselves into the arrest at issue.").

In this case, we have not only inconsistent explanations as to why the van was on the deserted parking lot but, even more suspicious, the bizarre explanation ("a lame excuse") offered by the driver about being there "to pick someone up" with no clue as to who was to be picked up. There was obviously something "fishy" about the explanation, and that is a pertinent circumstance in confirming an initial suspicion.

## E. The Analytic Focus Must Embrace the Totality of the Circumstances.

There might, of course, have been an innocent explanation for what the van was doing on the school parking lot on a Sunday evening. There might have been an innocent explanation for why it started to leave as the police approached. There might have been an innocent explanation for why the two persons on foot suddenly began to run at the approach of the police. There might have been an innocent explanation for the inherently strange and inconsistent purposes for being there stated by the driver and the front seat passenger. As *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), explained, however:

> *Terry itself involved "a series of acts, each of them perhaps innocent" if viewed separately, but which taken together warranted further investigation."* We noted in *[Illinois v. ]Gates[,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)] that *"innocent behavior will frequently provide the basis for a showing of probable cause,"* and that "[i]n making a determination of probable cause *the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."* That principle applies equally well to the reasonable suspicion inquiry.

(Emphasis supplied).

Even more emphatic in this regard is the recent unanimous decision of the Supreme Court in *United States v. Arvizu,* 534

U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The Court made it clear that an articulable suspicion determination must be made on the basis of the "totality of the circumstances."

> When discussing how *reviewing courts* should make reasonable-suspicion determinations, we have said repeatedly that they *must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.* This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." See also *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (reviewing court must give "due weight" to factual inference drawn by resident judges and local law enforcement officers).

534 U.S. at —— – ——, 122 S.Ct. at 750–51, 151 L.Ed.2d at 749–50 (emphasis supplied).

The Ninth Circuit, in ruling that a *Terry*-stop had been unreasonable, had looked at each of seven factors in isolation and had found each susceptible of an innocent explanation. In overruling the Ninth Circuit, the Supreme Court rejected that mode of evaluation.

> *The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the "totality of the circumstances,"* as our cases have understood that phrase. *The court appeared to believe that each observation by Stoddard that was by itself readily susceptible to an innocent explanation was entitled to "no weight."* Terry, *however, precludes this sort of divide-and-conquer analysis.* The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. *Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation."* See also *Sokolow* (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

534 U.S. at ——, 122 S.Ct. at 751, 151 L.Ed.2d at 750 (emphasis supplied).

The final holding of the Supreme Court left no doubt as to the proper standard of review.

*A determination that reasonable suspicion exists,* however, *need not rule out the possibility of innocent conduct.* Undoubtedly, *each of these factors alone is susceptible to innocent explanation,* and some factors are more probative than others. *Taken together,* we believe *they sufficed to form a particularized and objective basis for Stoddard's stopping the vehicle,* making the stop reasonable within the meaning of the Fourth Amendment.

534 U.S. at ——, 122 S.Ct. at 753, 151 L.Ed.2d at 752 (emphasis supplied).

The mosaic as a whole may depict a highly suspicious scene although none of its constituent tesserae, viewed in isolation, suggests anything untoward.

## F. Judge Kane's Ruling As to the Initial Stop

In ruling that there was articulable suspicion for a *Terry*-stop, Judge Kane explained:

THE COURT: ... [The police] had a complaint of suspicious activity at a school site on a Sunday evening. The police officer's reference was that this unknown anonymous individual complained about activity perhaps involving juveniles, as I recall it, and the suggestion of drug activity. The officers come to the scene: they see a van; as they approach the van, one of the officers sees two individuals walk away. Not only walk away, but trot away. That to me implies something other than walking. The van itself starts to pull away and the officers confront it. *I believe the officers had reasonable suspicion that there was criminal activity under foot and* had the right to at least make some, they *had a right to stop the van and to make some inquiry.* So what happens when they do? One of the officers speaks with the passenger, I think the front seat passenger, while the other officer speaks with the driver. He tells the driver

why, why they, they the police officers, are there in response to some complaints. The police officer then says, "Well why are [you] here?" The driver says to pick somebody up. Who, in essence the question is, "Well, who are you here to pick up?" "I don't know" [answers the driver]. The officer asks the driver to identify himself. The driver does not have a license on his person.

We hold that Judge Kane was correct in ruling that the police had articulable or reasonable suspicion that drug activity was afoot and, therefore, to detain the appellant and others for further investigation. We turn now to the scope of that detention.

## The Scope of the Stop

The second issue before us concerns not the initiation of the *Terry*-stop but rather the temporal scope (the duration) of the *Terry*-stop. Both parties refer to the duration of the *Terry*-stop, from the first stopping of the van until the canine "alert" provided probable cause for a *Carroll* Doctrine vehicle search, as one of "35 to 40" minutes. Taking that version of the facts most favorable to the prevailing party (the State), that necessarily reduces itself to a duration of 35 minutes. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Charity v. State*, 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000).

## Another False Trail:

## The Irrelevance of Traffic Stop Cases

This was not a traffic stop. In terms of the permitted temporal scope of this particular *Terry*-stop, the traffic stop cases have nothing to tell us. The appellant, however, argues the duration of the detention as if this were a traffic stop case. He relies heavily on our decision in *Snow v. State*, 84 Md.App. 243, 265, 578 A.2d 816 (1990). *Snow* involved a traffic stop for exceeding the speed limit. We held that once the purpose of the traffic stop had been fully accomplished, the detention

could not be prolonged in order to accomplish some other purpose not supported by articulable suspicion.

> The intrusion permitted "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Here, *the purpose of the stop was to warn or issue a ticket to Snow for speeding. That purpose was fully fulfilled,* but the detention was continued.

84 Md.App. at 264–65, 578 A.2d 816 (emphasis supplied).

The *Terry*-stop in this case was neither a traffic stop generally nor the opportunistic utilization of a traffic stop pursuant to *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), specifically. Those are situations in which the police must execute their traffic-related functions with diligence and may not prolong the traffic stop unnecessarily in order to "buy time" to carry out some extraneous investigative purpose for which they lack any particularized justification.

The *Terry*-stop in this case was from the outset an investigation into a suspected narcotics violation. The use of a drug-sniffing canine was in the direct service of that purpose and was not a gratuitous investigative technique hoping to piggyback on an unrelated traffic stop. The traffic stop cases are beside the point.

### The Supreme Court Cases

### On Temporal Scope

The Supreme Court has directly considered the permitted duration for a *Terry*-stop on two occasions. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), a detention that lasted for 90 minutes was held to have been excessive in scope. In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), a detention that lasted 20 minutes was held to have been not excessive in scope. In both cases, however, the Supreme Court made it very clear that the permitted temporal scope of a *Terry*-stop is not

something that may be measured by the ticking of the clock alone.

In *United States v. Place,* the suspect's luggage was detained at the La Guardia Airport for 90 minutes until a drug-sniffing dog could be brought to the scene. A critical factor in holding that there had been a scope violation was the fact that the police had known for several hours that Place was due to arrive at La Guardia and had made no effort to have the dog available at or shortly after the time of his arrival.

> [T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, *in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.* We note that here the New York agents knew the time of Place's scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests.

462 U.S. at 709, 103 S.Ct. 2637 (emphasis supplied).

In *Place,* the Supreme Court squarely rejected the notice of an arbitrary time limit on the permitted duration for a *Terry-*stop.

> Cf. ALI, Model Code of Pre Arraignment Procedure § 110.2(1) (1975) (recommending a maximum of 20 minutes for a Terry stop). We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, *we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.*

462 U.S. at 709 n. 10, 103 S.Ct. 2637 (emphasis supplied).

In *United States v. Sharpe,* a state highway patrolman, suspecting a narcotics violation, detained a suspect and his pickup truck for 20 minutes so that a DEA agent could arrive at the scene. The Fourth Circuit had concluded that "the

length of the detention alone transformed it from a *Terry*-stop into a de facto arrest." 470 U.S. at 683, 105 S.Ct. 1568. The Supreme Court reversed the Fourth Circuit and held that the detention was reasonable.

> The only issue in this case, then, is whether it was reasonable under the circumstances facing Agent Cooke and Officer Thrasher to detain Savage, whose vehicle contained the challenged evidence, for approximately 20 minutes. We conclude that the detention of Savage clearly meets the Fourth Amendment's standard of reasonableness.

470 U.S. at 683, 105 S.Ct. 1568.

The Supreme Court in *Sharpe* explicated its earlier decision in *Place*.

> [T]he rationale underlying that conclusion was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes. "[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."

470 U.S. at 684–85, 105 S.Ct. 1568. The Court in *Sharpe* held that a critical factor is whether the police were pursuing the investigative purpose that justified the initial stopping with due diligence.

> *In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly,* during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and *in such cases the court should not indulge in unrealistic second-guessing.* A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have

been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

We readily conclude that, given the circumstances facing him, Agent Cooke pursued his investigation in a diligent and reasonable manner.

470 U.S. at 686–87, 105 S.Ct. 1568 (emphasis supplied).

The *Sharpe* decision also rejected the notion of any *per se* rule.

The Court of Appeals' decision would effectively establish a per se rule that a 20–minute detention is too long to be justified under the Terry doctrine. Such a result is clearly and fundamentally at odds with our approach in this area.

470 U.S. at 686, 105 S.Ct. 1568.

### The Case Law Generally

### On the Scope of a Stop

### A. The Relationship of the Scope to the Purpose of the Stop

■ The permitted duration of a *Terry*-stop cannot be measured by the clock alone. Only that delay is permitted which is reasonably in the service of the purpose of the stop. *Stanford v. State,* 353 Md. 527, 542–43, 727 A.2d 938 (1999). That constraint is why traffic stops generally, and *Whren*-inspired traffic stops specifically, present only a limited window of opportunity for the police who would exploit them in order to serve some extraneous investigative purpose, such as checking for the possession of contraband drugs.

■ Once a reasonable time for the processing of a traffic charge has expired, even a minimal further delay to accommodate the arrival of a drug-sniffing canine is not permitted. *Graham v. State,* 119 Md.App. 444, 469, 705 A.2d 82 (1998). That foreclosure is for the obvious reason that the

dog sniff, however valuable it might be for other investigative purposes, does not in any way serve the purpose of the justifying traffic stop. Once the purpose of the traffic stop has been fully and reasonably served, no further detention is permitted—unless, in the course of the traffic stop, some independent articulable or reasonable suspicion has arisen to create some new and self-sufficient investigative purpose.

■ When, by contrast, the energizing articulable suspicion is that a violation of the drug laws may be afoot, the time constrictions on the *Terry*-stop are very different. The bringing of a drug-sniffing canine to the scene is in the direct service of that investigative purpose and the measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the scene. This use of a trained dog, as will be discussed, is an investigative practice that is looked upon with favor.

■ In the present case, of course, the reasonable suspicion was that the van and its occupants were involved in the distribution of controlled substances. The permitted scope of the stop depended, therefore, on how long it would reasonably take to get a drug-sniffing canine to the school parking lot.

## B. The Balance Between Societal Need and Degree of Intrusion

Self-evidently, a *Terry*-stop of a longer duration represents more of an intrusion on a citizen's freedom of movement than does a *Terry*-stop of a briefer duration. The reasonableness of a stop or a frisk requires balancing the degree of the intrusion against the societal need that justifies the intrusion. One of the key measures of societal need is the seriousness of the crime suspected. In *United States v. Oates,* 560 F.2d 45, 59 (2d Cir.1977), the United States Court of Appeals for the Second Circuit discussed this process of balancing.

> Inasmuch as "the reasonableness of [the officer's] conduct must be determined by balancing the need for the stop against the gravity of the intrusion which the stop entailed," it is readily apparent that the "specific and articulable facts"

and the inferences that can be drawn from these facts relate to the need for the stop. *"Need,"* in turn, *depends on factors such as the seriousness of the offense* and the likelihood of the detainee's involvement in the known or suspected criminal activity. Obviously, if the offense is minor and there is substantial uncertainty that the detainee is involved, only a minimally intrusive stop would be proper. On the other hand, *when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified.*

(Emphasis supplied).

The crime suspected by the police in the present case was not the mere use of controlled substances by private persons; it was the commercial distribution of such substances to others. Involved, moreover, was the suspected distribution of controlled substances not to adults but to juveniles. The *Oates* opinion discussed the difference between users and dealers and the significance of that difference in the measuring of societal need.

Of course, "need" for the stop decreases if the suspect is known as a user rather than a dealer. "Need" also decreases if the suspect is known to be associated only with drugs commonly regarded as substantially less injurious than heroin.

560 F.2d at 59 n. 11.

With hindsight, we now know that the controlled substance being distributed by the appellant on that schoolyard was marijuana. From the perspective of the police at the time of the *Terry*-stop, however, (and that is the perspective from which Fourth Amendment reasonableness must be measured), the suspected distribution could as readily have been of heroin or cocaine. The societal need in this case was a heavy one.

With respect to the other pan of the balance scales, Wayne R. LaFave, *Search and Seizure* (3d ed.1996), Sect. 9.2(f), pp. 59–60, has noted:

[I]n determining whether the length of time between the initiation of the stop and the later release or arrest was reasonable, courts should assay the facts of the particular case, *including whether delay would seriously interrupt the suspect's travels.*

(Emphasis supplied). Professor LaFave cites for that proposition both the recognition by the Supreme Court in *United States v. Place* of the "liberty interest in proceeding with [an] itinerary," 462 U.S. at 708, 103 S.Ct. 2637, and the case of *United States v. Tavolacci,* 895 F.2d 1423, 1428 (D.C.Cir.1990) (The length of a detention is more likely to pass muster if "the detention did not interfere with defendant's travel plans.").

In this case we cannot help but note that at the time of the initial *Terry*-stop the alleged purpose of the driver of the van was to pick up, there on the schoolyard, an unnamed passenger who had not yet arrived. The alleged purpose of the appellant was "to hang out." Their expressed purposes or desires were more in terms of stasis than of movement. In noting the more minimal nature of the intrusion, therefore, we fail to see how the detention interfered significantly with either of those purposes or "itineraries."

## C. The Canine Sniff As a Favored Investigative Technique

The canine "sniff" has regularly been deemed particularly compatible with the limited intrusiveness favored by stop-and-frisk law. The Eleventh Circuit put its imprimatur on the canine sniff in *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988):

*The canine sniff* ordered in this case *is the kind of brief, minimally intrusive investigation technique that may justify a Terry stop.* As the Supreme Court noted in *Place,* a canine sniff does not require the opening of luggage and does not reveal intimate but noncontraband items to the public view. *"The manner in which information is obtained through this investigative technique is much less intrusive than a typical search." Place,* 462 U.S. at 707,

103 S.Ct. at 2644; *see also Florida v. Royer,* 460 U.S. at 505–06, 103 S.Ct. at 1328–29 (suggesting that police questioning of suspect may not be justified under circumstances where *canine sniff would confirm or dispel suspicions* ). Nor does a canine sniff involve the time-consuming disassembly of luggage or an automobile frequently required in a thorough search for contraband.

(Emphasis supplied).

*State v. Gant,* 637 So.2d 396, 397 (La.1994), also praised the use of a drug-sniffing dog as a technique whereby the police "pursued a means of investigation likely to confirm or dispel their suspicions quickly."

### D. Diligence in Summoning a Dog

Following the initial stopping of the van, approximately ten minutes went by in which the police first sought the operator's card of the driver and then questioned first the driver and then the appellant about what they were doing on the school parking lot. Consent was then sought for a search of the van, which consent was refused. It was at that point that the police requested that a drug-sniffing canine be brought to the scene. The dog arrived less than twenty-five minutes later. We see no lack of diligence.

In *United States v. Hardy,* 855 F.2d 753 (11th Cir.1988), a stop of 50 minutes was deemed to have been reasonable for bringing a dog to the scene of the stop.

The investigative stop in this case lasted approximately fifty minutes, from about 9:34 p.m., when Ralston informed appellants that they would be detained for a narcotics sniff, until about 10:25 p.m., when the narcotics dog alerted to the presence of drugs in the trunk.

. . . .

On the facts of this case, . . . we cannot say the length of the stop, by itself, invalidated the detention.

855 F.2d at 761. See also *United States v. French,* 974 F.2d 687, 692–93 (6th Cir.1992) (a 45 minute delay while a drug dog was brought to a truck stopped on a highway); *United States*

*v. Glover,* 957 F.2d 1004, 1012–13 (2d Cir.1992) (a 30 minute detention was reasonable because a "narcotics dog was on the way"); *Cresswell v. State,* 564 So.2d 480, 481 (Fla.1990) (a 45 minute detention was reasonable because it was "the time necessary to obtain a narcotics dog"); *State v. Gant,* 637 So.2d 396, 397 (La.1994) (a 30 minute detention was reasonable while a drug dog was brought to the scene). And see *United States v. Hooper,* 935 F.2d 484, 498 (2d Cir.1991) (30 minute detention pending arrival of narcotics dog); *United States v. Knox,* 839 F.2d 285, 290–91 (6th Cir.1988) (30 minute detention pending arrival of narcotics dog); *United States v. Sullivan,* 903 F.2d 1093, 1097–98 (7th Cir.1990) (45 minute detention pending arrival of narcotics dog); *United States v. Sterling,* 909 F.2d 1078, 1081, 1085 (7th Cir.1990) (75 minute delay pending arrival of narcotics dog); *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991) (30 minute detention pending arrival of narcotics dog); *United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (20 to 30 minute detention pending arrival of narcotics dog); *United States v. Borrero,* 770 F.Supp. 1178, 1189–91 (E.D.Mich.1991) (70 minute detention pending arrival of narcotics dog).

## Judge Kane's Ruling

## On the Length of Detention

Judge Kane ruled that, based on the purpose of the stop, the summoning of the drug-sniffing canine was "a means of investigation that was likely to confirm or dispel the suspicions quickly." *United States v. Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568. He further ruled that the duration of the detention was not unreasonable.

> The officer then makes some warrant checks, in the process of doing that the other officer calls for a drug dog. I don't find under the facts of the case that the detention of these individuals was under some guise or just to get a drug dog on site. So I believe the evidence is that when the drug dog arrived the officer had at least three of the individuals. I don't find that under the circumstances that's an unreason-

able time to conduct this investigation of the school property.

The drug dog comes to the scene. He alerts on the vehicle, the officers search the vehicle and find marijuana. I believe that the search is proper, that it's not violative of the defendant's rights so I'll deny the motion.

\* \* \*

We affirm Judge Kane's ruling that the evidence produced by the search of the van should not have been suppressed.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**